# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued January 7, 2010         Decided May 21, 2010

No. 09-5265

FADI AL MAQALEH, DETAINEE AND AHMAD AL MAQALEH, AS
NEXT FRIEND OF FADI AL MAQALEH,
APPELLEES

v.

ROBERT M. GATES, SECRETARY, UNITED STATES
DEPARTMENT OF DEFENSE, ET AL.,
APPELLANTS

Consolidated with 09-5266, 09-5267

Appeals from the United States District Court
for the District of Columbia
(No. 1:06-cv-01669-JDB)

*Neal Kumar Katyal*, Deputy Solicitor General, U.S. Department of Justice, argued the cause for appellants. With him on the briefs were *Beth S. Brinkmann*, Deputy Assistant Attorney General, and *Douglas N. Letter* and *Robert M. Loeb*, Attorneys.

*David B. Rivkin Jr.*, *Lee A. Casey*, and *Carlos Ramos-Mrosovsky* were on the brief for *amici curiae* Special Forces Association, et al. in support of appellants.

*Tina Monshipour Foster* argued the cause for appellees. With her on the brief were *Barbara J. Olshansky* and *Ramzi Kassem*.

*George Brent Mickum IV* was on the brief for *amici curiae* Constitutional Law Scholars in support of appellees and affirmance.

*Walter Dellinger* and *Matthew Shors* were on the brief for *amici curiae* Non-Governmental Organizations in support of appellees.

*Paul M. Smith* and *Emily Berman* were on the brief for *amicus curiae* Retired Military Officers in support of appellees.

*Douglas W. Baruch* was on the brief for *amici curiae* Professors of International Human Rights Law and Related Subjects in support of appellees.

Before: SENTELLE, *Chief Judge*, TATEL, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

SENTELLE, *Chief Judge*: Three detainees at Bagram Air Force Base in Afghanistan petitioned the district court for habeas corpus relief from their confinement by the United States military.[1] Appellants (collectively "the United States" or "the government") moved to dismiss for lack of jurisdiction based on § 7(a) of the Military Commissions Act of 2006, Pub. L. No. 109-366, 120 Stat. 2600 (2006) ("MCA"). The district court

---

[1]A fourth petition consolidated with these three in the district court was dismissed by the district court for lack of jurisdiction and is not a part of this interlocutory appeal.

agreed with the United States that § 7(a) of the MCA purported to deprive the court of jurisdiction, but held that this section could not constitutionally be applied to deprive the court of jurisdiction under the Supreme Court's test articulated in *Boumediene v. Bush*, 128 S. Ct. 2229 (2008). The court therefore denied the motion to dismiss but certified the three habeas cases for interlocutory appeal under 28 U.S.C. § 1292(b). Pursuant to that certification, the government filed a petition to this court for interlocutory appeal. We granted the petition and now consider the jurisdictional question. Upon review, and applying the Supreme Court decision in *Boumediene*, we determine that the district court did not have jurisdiction to consider the petitions for habeas corpus. We therefore reverse the order of the district court and order that the petitions be dismissed.

## I. Background

A. *The Petitioners*

All three petitioners are being held as unlawful enemy combatants at the Bagram Theater Internment Facility on the Bagram Airfield Military Base in Afghanistan.[2] Petitioner Fadi Al-Maqaleh is a Yemeni citizen who alleges he was taken into custody in 2003. While Al-Maqaleh's petition asserts "on information and belief" that he was captured beyond Afghan borders, a sworn declaration from Colonel James W. Gray, Commander of Detention Operations, states that Al-Maqaleh was captured in Zabul, Afghanistan. Redha Al-Najar is a Tunisian citizen who alleges he was captured in Pakistan in 2002. Amin Al-Bakri is a Yemeni citizen who alleges he was

---

[2]As the distinction generally makes little difference, we will use "Bagram" to refer to both the Internment Facility and the Military Base, unless the context indicates otherwise.

captured in Thailand in 2002. Both Al-Najar and Al-Bakri allege they were first held in some other unknown location before being moved to Bagram.

B. *The Place of Confinement*

Bagram Airfield Military Base is the largest military facility in Afghanistan occupied by United States and coalition forces. The United States entered into an "Accommodation Consignment Agreement for Lands and Facilities at Bagram Airfield" with the Islamic Republic of Afghanistan in 2006, which "consigns all facilities and land located at Bagram Airfield . . . owned by [Afghanistan,] or Parwan Province, or private individuals, or others, for use by the United States and coalition forces for military purposes." (Accommodation and Consignment Agreement for Lands and Facilities at Bagram Airfield Between the Islamic Republic of Afghanistan and the United States of America) (internal capitalization altered). The Agreement refers to Afghanistan as the "host nation" and the United States "as the lessee." The leasehold created by the agreement is to continue "until the United States or its successors determine that the premises are no longer required for its use." *Id.* (internal capitalization altered).

Afghanistan remains a theater of active military combat. The United States and coalition forces conduct "an ongoing military campaign against al Qaeda, the Taliban regime, and their affiliates and supporters in Afghanistan." These operations are conducted in part from Bagram Airfield. Bagram has been subject to repeated attacks from the Taliban and al Qaeda, including a March 2009 suicide bombing striking the gates of the facility, and Taliban rocket attacks in June of 2009 resulting in death and injury to United States service members and other personnel.

While the United States provides overall security to Bagram, numerous other nations have compounds on the base. Some of the other nations control access to their respective compounds. The troops of the other nations are present at Bagram both as part of the American-led military coalition in Afghanistan and as members of the International Security Assistance Force (ISAF) of the North Atlantic Treaty Organization. The mission of the ISAF is to support the Afghan government in the maintenance of security in Afghanistan. *See* S.C. Res. 1386, U.N. Doc. S/RES/1386 (Dec. 20, 2001); S.C. Res. 1510, U.N. Doc. S/RES/1510 (Oct. 13, 2003); S.C. Res. 1833, U.N. Doc. S/RES/1833 (Sept. 22, 2008). According to the United States, as of February 1, 2010, approximately 38,000 non-United States troops were serving in Afghanistan as part of the ISAF, representing 42 other countries. *See* International Security Assistance Force, *International Security Assistance Force and Afghan National Army Strength & Laydown*, http://www.nato.int/isaf/docu/epub/pdf/placemat.pdf.

C. *The Litigation*

Appellees in this action, three detainees at Bagram, filed habeas petitions against the President of the United States and the Secretary of Defense in the district court. The government moved to dismiss for lack of jurisdiction, relying principally upon § 7(a) of the Military Commissions Act of 2006. The district court consolidated these three cases and a fourth case, not a part of these proceedings, for argument. After the change in presidential administrations on January 22, 2009, the court invited the government to express any change in its position on the jurisdictional question. The government informed the district court that it "adheres to its previously articulated position."

The district court, recognizing that the issue of whether the court had jurisdiction presented a controlling question of law as to which there were substantial grounds for difference of opinion, certified the question for interlocutory appeal under 28 U.S.C. § 1292(b). *Al Maqaleh v. Gates*, 620 F. Supp. 2d 51, 54-56 (D.D.C. 2009). We accepted the case for interlocutory review, *In re Gates*, No. 09-8004, 2009 U.S. App. LEXIS 17032 (D.C. Cir. July 30, 2009), bringing the jurisdictional issue before us in the present appeal.

## II. Analysis

A. *The Legal Framework*

While we will discuss specific points of law in more detail below, for a full understanding, we must first set forth some of the legal history underlying the controversy over the availability of the writ of habeas corpus and the constitutional protections it effectuates to noncitizens of the United States held beyond the sovereign territory of the United States. The Supreme Court first addressed this issue in *Johnson v. Eisentrager*, 339 U.S. 763 (1950). In *Eisentrager* 21 German nationals petitioned the district court for writs of habeas corpus. The *Eisentrager* petitioners had been convicted by a military commission in China of "engaging in, permitting or ordering continued military activity against the United States after surrender of Germany and before surrender of Japan." *Id.* at 766. Because, during that period, the United States and Germany were no longer at war, hostile acts against the United States by German citizens were violations of the law of war. Petitioners were captured in China, tried in China, and repatriated to Germany to serve their sentences in Landsberg Prison, a facility under the control of the United States as part of the Allied Powers' post-war occupation. *Id.* None ever entered the United States, nor were any held in the United States.

Petitioners sought habeas relief, alleging that their confinement was in violation of the Constitution and laws of the United States and the Geneva Convention. *Id.* at 767; *see also Eisentrager v. Forrestal*, 174 F.2d 961 (D.C. Cir. 1949). The district court held that under *Ahrens v. Clark*, 335 U.S. 188 (1948), statutory jurisdiction over habeas petitions did not extend to aliens who were neither confined nor convicted in the district of the court and whose custodians were beyond geographic boundaries of the district in which the court sat. The court dismissed the writ. The petitioners appealed. The Court of Appeals reversed the district court's judgment.

The Court of Appeals read *Ahrens* as having left open the governing questions of the controversy before it, and held that since "[t]he right to habeas corpus is an inherent common law right," *Eisentrager v. Forrestal*, 174 F.2d at 965, a jurisdictional statute could not deprive anyone of whatever would be the fundamental right to habeas corpus because of the provision in Article I of the Constitution that the "Federal Government cannot suspend the privilege, except when, in cases of rebellion or invasion, the public safety may so require." 174 F.2d at 965-66 (citing U.S. CONST. Art. I, § 9, cl. 2).

The court reasoned that as "Congress could not effectuate by omission that which it could not accomplish by affirmative action," if the existing jurisdictional act had the effect of depriving a person entitled to the writ of his substantive right, the act would be unconstitutional, and therefore the court must construe it "if possible to avoid that result." *Id.* at 966. The court ruled that the district court that had jurisdiction over the superior officers of the immediate jailer would have jurisdiction to hear the petition and grant or deny the writ. *Id.* at 967. The Secretary of Defense became the relevant official. He sought certiorari from the Supreme Court. The Supreme Court granted review and reversed. By way of introduction to its reasoning,

the Court noted that "[w]e are cited to no instance where a court, in this or any other country where the writ is known, has issued it on behalf of an alien enemy who, at no relevant time and in no stage of his captivity, has been within its territorial jurisdiction." *Eisentrager*, 339 U.S. at 768.

The Court went on to hold that the writ was unavailable to the enemy aliens beyond the sovereign territory of the United States. The Court did not end its discussion with the language concerning sovereignty, however. It noted that trial of the writ "would hamper the war effort and bring aid and comfort to the enemy." *Id.* at 779. The Court further noted that such trial would constitute "effective fettering of a field commander," by allowing "the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home." *Id.*

The *Eisentrager* case remained the governing precedent concerning the jurisdiction of United States courts over habeas petitions on behalf of aliens held outside the sovereign territory of the United States until the Court revisited the question in *Rasul v. Bush*, 542 U.S. 466 (2004). In *Rasul* the petitioners were aliens (not from enemy nations) who were captured abroad during hostilities between the United States and the Taliban. The United States transported them to the naval base at Guantanamo Bay, Cuba, which the United States holds under a 1903 lease agreement specifying that: "the United States recognizes the continuance of the ultimate sovereignty of the Republic of Cuba over the [leased areas]." *Id.* at 471 (quoting the lease agreement). Thus, the habeas corpus petitioners were foreign nationals, not from nations currently in a state of war with the United States, taken by the United States military, and transported to locations outside the sovereign territory of the United States. Relying on *Eisentrager*, the district court

9

dismissed the case for lack of jurisdiction. *Rasul v. Bush*, 215 F. Supp. 2d 55 (D.D.C. 2002). This court affirmed. In *Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003), we called it "the heart of *Eisentrager*," that the writ cannot be "made available to aliens abroad when basic constitutional protections are not." *Id.* at 1411. The detainees petitioned for certiorari to the Supreme Court. The Supreme Court granted review.

The district court and the Court of Appeals had accepted the government's argument that the relevant facts of *Rasul* were not distinguishable from those in *Eisentrager* in any material way. The Supreme Court, while not overruling *Eisentrager*, explained that the lower courts had misinterpreted the earlier Supreme Court decision. The *Rasul* Court stated that the consolidated cases before it "present the narrow but important question whether United States courts lack jurisdiction to consider challenges to the legality of the detention of foreign nationals captured abroad in connection with hostilities and incarcerated at the Guantanamo Bay Naval Base, Cuba." 542 U.S. at 470. The Court explained that the *Eisentrager* decision dealt primarily with constitutional jurisdiction, with little to say as to the "petitioners' *statutory* entitlement to habeas review." *Id.* at 476 (emphasis in the original). More specifically, the *Rasul* Court opined that the *Eisentrager* Court was construing the effect of *Ahrens v. Clark*. The posture of the petitions before the *Eisentrager* Court was that the Court of Appeals had concluded that the *Ahrens* decision created a "statutory gap" which the Court of Appeals in *Eisentrager* had seen as an unconstitutional gap to be filled by reference to "fundamentals." *Rasul* at 478 (quoting 174 F.2d at 963). The Supreme Court in *Eisentrager* agreed that the *Ahrens* decision controlled as to statutory jurisdiction but did not agree with the Court of Appeals that the gap was unconstitutional. The *Rasul* Court treated the *Ahrens* analysis as being essential to the decision in *Eisentrager*, and held that *Ahrens* has been overruled by *Braden v. 30th*

*Judicial Circuit Court of Kentucky*, 410 U.S. 484 (1973), in which, according to the *Rasul* Court, the Supreme Court held "contrary to *Ahrens*, that the prisoner's presence within the territorial jurisdiction of the district court is not 'an invariable prerequisite' to the exercise of district court jurisdiction under the federal habeas statute." *Id.* at 478.

The *Rasul* Court reasoned that because *Braden* overruled the statutory predicate to *Eisentrager*'s holding, *Eisentrager* did not compel a holding that the courts lack jurisdiction to issue the writ. The *Rasul* Court then held that the habeas statute did extend geographically to the base at which the petitioners were held in Guantanamo. "At common law, courts exercised habeas jurisdiction over the claims of aliens detained within sovereign territory of the realm . . . ." *Id.* at 481. Citing Lord Mansfield from 1759, the *Rasul* majority stated that "there was 'no doubt' as to the court's power to issue writs of habeas corpus if the territory was 'under the subjection of the Crown.'" *Id.* at 482 (citing *King v. Cowle*, 2 Burr. 834, 854-55, 97 Eng. Rep. 587, 598-99 (K.B.)). The Court noted that no one questioned the district court's jurisdiction over the custodians of the petitioners and "therefore [held] that § 2241 confers on the district court jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base." *Id.* at 484. Finally, the Court concluded that

> [w]hat is presently at stake is . . . whether the federal courts have jurisdiction to determine the legality of the Executive's potentially indefinite detention of individuals who claim to be wholly innocent of wrongdoing.

542 U.S. at 485. The Court "[a]nswer[ed] that question in the affirmative, . . . reverse[d] the judgment of the Court of Appeals and remand[ed] the[] cases for the district court to consider in

the first instance the merits of the petitioners' claims." *Id.*

Responding to the *Rasul* decision, Congress passed the Detainee Treatment Act of 2005, Pub. L. No. 109-148, 119 Stat. 2739 (2005) (DTA), which President Bush signed into law on December 30 of that year. Among other things, that Act added a new provision to the Habeas Act which provided that:

> Except as provided in section 1005 of the [DTA][3], no court, justice, or judge shall have jurisdiction to hear or consider –
>
>> (1) an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba; or
>>
>> (2) any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba, who
>>
>>> (A) is currently in military custody; or
>>>
>>> (B) has been determined by the United States Court of Appeals for the District of Columbia Circuit . . . to have been properly detained as an enemy combatant.

_____

[3]The reference to § 1005 as an exception to the jurisdiction stripping provision refers to subsections of the DTA which provided for exclusive judicial review of Combatant Status Review Tribunal determinations and military commission decisions by the United States Court of Appeals for the District of Columbia Circuit.

In June of 2006, the Supreme Court decided *Hamdan v. Rumsfeld*, 548 U.S. 557 (2006), which reversed another decision of this court. *See Hamdan v. Rumsfeld*, 415 F.3d 33 (D.C. Cir. 2005). In *Hamdan*, the Supreme Court held that the DTA did not operate to strip the federal courts of jurisdiction to hear petitions for writs of habeas corpus on behalf of Guantanamo detainees that were pending at the time of the DTA's enactment. Therefore, the Supreme Court reversed this court's dismissal of the petitions and remanded again for further proceedings.

In October of 2006, in response to the *Hamdan* decision, Congress passed the Military Commissions Act of 2006 (MCA), Pub. L. No. 109-366, 120 Stat. 2600 (2006). That Act, among many other things, included a further amendment to the habeas statute. The new amendment reads:

> (1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

> (2) Except as provided in [section 1005(e)(2) and (e)(3) of the DTA], no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

13

Congress went on to explicitly state:

> The amendment made by subsection (a) shall take effect on the date of the enactment of this Act, and shall apply to all cases, without exception, pending on or after the date of the enactment of this Act which relate to any aspect of the detention, transfer, treatment, trial, or conditions of detention of an alien detained by the United States since September 11, 2001.

This clearer statement of congressional intent to strip the courts of habeas jurisdiction set the stage for an inevitable determination of the constitutionality of such a stripping in light of the Suspension Clause, U.S. CONST. Art. I, § 9, cl. 2. That case came to us in *Boumediene v. Bush*, 476 F.3d 981 (2007). A divided panel held that the statute was constitutional.

In *Boumediene*, we reasoned that the *Rasul* decision had not overruled *Eisentrager*, and therefore the earlier case remained precedentially binding upon us. We read *Eisentrager* as holding that constitutional habeas rights did not extend to any aliens who had never been in or brought into the sovereign territory of the United States. We further reasoned that Congress's power to regulate our jurisdiction permitted Congress to strip the courts of any jurisdiction to hear habeas claims for aliens who had no constitutional right to habeas relief, without regard to the Suspension Clause. The Supreme Court in *Boumediene v. Bush*, 553 U.S. 723, 128 S. Ct. 2229 (2008), reversed our decision.

At the outset, the Supreme Court agreed with our court that the Military Commissions Act, 28 U.S.C. § 2241(e), did in fact "deprive[] the federal courts of jurisdiction to entertain the habeas corpus actions" by the detainees held at Guantanamo Bay. 128 S. Ct. at 2244. The Court therefore faced the

14

constitutional questions

> whether petitioners are barred from seeking the writ or invoking the protections of the Suspension Clause either because of their status, . . . designation by the Executive Branch as enemy combatants, or their physical location . . . at Guantanamo Bay.

*Id.*

In a thorough and detailed opinion, the Court undertook its inquiry into the constitutional questions on two levels. First, it explored the breadth of the Court's holding in *Eisentrager* (still not overruled) in response to the argument by the United States that constitutional rights protected by the writ of habeas corpus under the Suspension Clause extended only to territories over which the United States held *de jure* sovereignty. Second, it explored the more general question of extension of constitutional rights and the concomitant constitutional restrictions on governmental power exercised extraterritorially and with respect to noncitizens. In so doing, the Court set forth a "broad historical narrative of the writ [of habeas corpus] and its function . . . ." *Id.* at 2248. While the Court concluded that the historical record did not provide a clear answer, it accepted the government's position that the United States did not exercise *de jure* sovereignty over Guantanamo Bay, but took notice of "the obvious and uncontested fact that the United States, by virtue of its complete jurisdiction and control over the base, maintains *de facto* sovereignty over this territory." *Id.* at 2253 (citing *Rasul*, 542 U.S. at 480). However, the Court further concluded that "the Government's premise that *de jure* sovereignty is the touchstone of habeas jurisdiction. . . . is unfounded." *Id.*

15

The Court reasoned that the adoption of a bright-line rule based on *de jure* sovereignty would be inconsistent with a long line of Supreme Court cases exploring "the Constitution's geographic scope." *Id.* In explaining this proposition, the Court explored the series of opinions known as the "Insular Cases," in which the Court had "addressed whether the Constitution, by its own force, applies in any territory that is not a state." *Id.* at 2254 (citing *De Lima v. Bidwell*, 182 U.S. 1 (1901); *Dooley v. United States*, 182 U.S. 222 (1901); *Armstrong v. United States*, 182 U.S. 243 (1901), *Downes v. Bidwell*, 182 U.S. 244 (1901); *Hawaii v. Mankichi*, 190 U.S. 197 (1903); *Dorr v. United States*, 195 U.S. 138 (1904)). The *Boumediene* Court recalled the practical doctrine drawn from the Insular Cases and applied in such later decisions as *Reid v. Covert*, 354 U.S. 1 (1957), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), applying the Constitution by its own force in territories which were destined for apparent statehood, but recognizing a more practical and selective application of constitutional protection of rights in territories temporarily held by the United States, or in acts by the United States government outside United States territory altogether.

More directly pertinent to the issue before us today, the Court stated that "nothing in *Eisentrager* says that *de jure* sovereignty is or has ever been the only relevant consideration in determining the geographic reach of the Constitution or of habeas corpus." 128 S. Ct. at 2258. The Court explained that such a holding would have been inconsistent with the Insular Cases and *Reid*. Seeing no need to create such a conflict between its holdings, the Court found what it called "a common thread uniting the Insular Cases, *Eisentrager*, and *Reid*: the idea that questions of extraterritoriality turn on objective factors and practical concerns, not formalism." *Id.*

Applying the "common thread" to the question of the jurisdiction of United States courts to consider habeas petitions from detainees in Guantanamo, the Court concluded that "at least three factors are relevant in determining the reach of the Suspension Clause." *Id.* at 2259. Those three factors, which we must apply today in answering the same question as to detainees at Bagram, are:

> (1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ.

*Id.* Applying these factors to the detainees at Guantanamo, the Court held that the petitioners had the protection of the Suspension Clause.

B. *Application to the Bagram Petitioners*

Our duty, as explained above, is to determine the reach of the right to habeas corpus and therefore of the Suspension Clause to the factual context underlying the petitions we consider in the present appeal. In doing so, we are controlled by the Supreme Court's interpretation of the Constitution in *Eisentrager* as construed and explained in the Court's more recent opinion in *Boumediene*. This is not an easy task, as illustrated by the thorough and careful opinion of the district court. While we are properly respectful of the district court's careful undertaking of this difficult task, as we review rulings on motions to dismiss under Federal Rule of Civil Procedure 12 *de novo*, we reexamine the issue and ultimately reach a different conclusion.

At the outset, we note that each of the parties has asserted both an extreme understanding of the law after *Boumediene* and a more nuanced set of arguments upon which each relies in anticipation of the possible rejection of the bright-line arguments. The United States would like us to hold that the *Boumediene* analysis has no application beyond territories that are, like Guantanamo, outside the *de jure* sovereignty of the United States but are subject to its *de facto* sovereignty. As the government puts it in its reply brief, "[t]he real question before this Court, therefore, is whether Bagram may be considered effectively part of the United States in light of the nature and history of the U.S. presence there." Reply Br. of the United States at 7. We disagree.

Relying upon three independent reasons, the Court in *Boumediene* expressly repudiated the argument of the United States in that case to the effect "that the *Eisentrager* Court adopted a formalistic, sovereignty-based test for determining the reach of the Suspension Clause." 128 S. Ct. at 2257. Briefly put, the High Court rejected that argument first on the basis that the *Eisentrager* Court's further analysis beyond recitations concerning sovereignty would not have been undertaken by the Court if the sovereignty question were determinative. The *Boumediene* Court explicitly did "not accept the idea that . . . the [sovereignty discussion] from *Eisentrager* is the only authoritative language in the opinion and that all the rest is dicta. The Court's further determinations, based on practical considerations, were integral to Part II of its opinion and came before the decision announced its holding." *Id.* Second, the Court rejected the Government's reading of *Eisentrager* because the meaning of the word "sovereignty" in the *Eisentrager* opinion was not limited to the "narrow technical sense" of the word and could be read "to connote the degree of control the military asserted over the facility." *Id.* The third reason is the one we noted above, that is, that the Court concluded that such

18

a reading of *Eisentrager* as proposed by the United States "would have marked not only a change in, but a complete repudiation of, the Insular Cases' (and later *Reid*'s) functional approach to questions of extraterritoriality." *Id.* at 2258.

True, the second factor articulated in *Boumediene* for rejecting the government's reading of *Eisentrager* might apply differently in this case because of differences in the levels of control over the military facilities. But we must keep in mind that the second factor is only one of the three reasons offered by the *Boumediene* Court for the rejection of "a formalistic, sovereignty-based test for determining the reach of the Suspension Clause." *Id.* at 2257. Whatever the force of the second reason offered by the Court in *Boumediene*, the first and third reasons make it plain that the Court's understanding of *Eisentrager*, and therefore of the reach of the Suspension Clause, was based not on a formalistic attachment to sovereignty, but on a consideration of practical factors as well. We note that the very fact that the *Boumediene* Court set forth the three-factor test outlined above parallels the *Eisentrager* Court's further reasoning addressed by the *Boumediene* Court in its rejection of the bright-line *de jure* sovereignty argument before it. That is, had the *Boumediene* Court intended to limit its understanding of the reach of the Suspension Clause to territories over which the United States exercised *de facto* sovereignty, it would have had no need to outline the factors to be considered either generally or in the detail which it in fact adopted. We therefore reject the proposition that *Boumediene* adopted a bright-line test with the effect of substituting *de facto* for *de jure* in the otherwise rejected interpretation of *Eisentrager*.

For similar reasons, we reject the most extreme position offered by the petitioners. At various points, the petitioners seem to be arguing that the fact of United States control of

19

Bagram under the lease of the military base is sufficient to trigger the extraterritorial application of the Suspension Clause, or at least satisfy the second factor of the three set forth in *Boumediene*. Again, we reject this extreme understanding. Such an interpretation would seem to create the potential for the extraterritorial extension of the Suspension Clause to noncitizens held in any United States military facility in the world, and perhaps to an undeterminable number of other United States-leased facilities as well. Significantly, the court engaged in an extended dialog with counsel for the petitioners in which we repeatedly sought some limiting principle that would distinguish Bagram from any other military installation. Counsel was able to produce no such distinction. *See* Transcript of Oral Argument, pp. 30-47. Again, such an extended application is not a tenable interpretation of *Boumediene*. If it were the Supreme Court's intention to declare such a sweeping application, it would surely have said so. Just as we reject the extreme argument of the United States that would render most of the decision in *Boumediene* dicta, we reject the first line of argument offered by petitioners. Having rejected the bright-line arguments of both parties, we must proceed to their more nuanced arguments, and reach a conclusion based on the application of the Supreme Court's enumerated factors to the case before us.

The first of the enumerated factors is "the citizenship and status of the detainee and the adequacy of the process through which that status determination was made." Citizenship is, of course, an important factor in determining the constitutional rights of persons before the court. It is well established that there are "constitutional decisions of [the Supreme] Court expressly according differing protection to aliens than to citizens." *United States v. Verdugo-Urquidez*, 494 U.S. at 273. However, clearly the alien citizenship of the petitioners in this case does not weigh against their claim to protection of the right

of habeas corpus under the Suspension Clause.  So far as citizenship is concerned, they differ in no material respect from the petitioners at Guantanamo who prevailed in *Boumediene*.  As to status, the petitioners before us are held as enemy aliens.  But so were the *Boumediene* petitioners.  While the *Eisentrager* petitioners were in a weaker position by having the status of war criminals, that is immaterial to the question before us.  This question is governed by *Boumediene* and the status of the petitioners before us again is the same as the Guantanamo detainees, so this factor supports their argument for the extension of the availability of the writ.

So far as the adequacy of the process through which that status determination was made, the petitioners are in a stronger position for the availability of the writ than were either the *Eisentrager* or *Boumediene* petitioners.  As the Supreme Court noted, the *Boumediene* petitioners were in a very different posture than those in *Eisentrager* in that "there ha[d] been no trial by military commission for violations of the laws of war." 128 S. Ct. at 2259.  Unlike the *Boumediene* petitioners or those before us, "[t]he *Eisentrager* petitioners were charged by a bill of particulars that made detailed factual allegations against them."  *Id.* at 2260.  The *Eisentrager* detainees were "entitled to representation by counsel, allowed to introduce evidence on their own behalf, and permitted to cross-examine the prosecution's witnesses" in an adversarial proceeding.  *Id.*  The status of the *Boumediene* petitioners was determined by Combatant Status Review Tribunals (CSRTs) affording far less protection.  Under the CSRT proceeding, the detainee, rather than being represented by an attorney, was advised by a "Personal Representative" who was "not the detainee's lawyer or even his 'advocate.'"  *Id.*  The CSRT proceeding was less protective than the military tribunal procedures in *Eisentrager* in other particulars as well, and the Supreme Court clearly stated that "[t]he difference is not trivial."  *Id.* at 2259.

The status of the Bagram detainees is determined not by a Combatant Status Review Tribunal but by an "Unlawful Enemy Combatant Review Board" (UECRB). As the district court correctly noted, proceedings before the UECRB afford even less protection to the rights of detainees in the determination of status than was the case with the CSRT.[4] Therefore, as the district court noted, "while the important adequacy of process factor strongly supported the extension of the Suspension Clause and habeas rights in *Boumediene*, it even more strongly favors petitioners here." *Al Maqaleh*, 604 F. Supp. 2d at 227. Therefore, examining only the first of the Supreme Court's three enumerated factors, petitioners have made a strong argument that the right to habeas relief and the Suspension Clause apply in Bagram as in Guantanamo. However, we do not stop with the first factor.

The second factor, "the nature of the sites where apprehension and then detention took place," weighs heavily in favor of the United States. Like all petitioners in both *Eisentrager* and *Boumediene*, the petitioners here were apprehended abroad. While this in itself would appear to weigh against the extension of the writ, it obviously would not be sufficient, otherwise *Boumediene* would not have been decided as it was. However, the nature of the place where the detention takes place weighs more strongly in favor of the position argued by the United States and against the extension of habeas jurisdiction than was the case in either *Boumediene* or *Eisentrager*. In the first place, while *de facto* sovereignty is not

---

[4]The Government argues that in our analysis of this first factor, we should consider new procedures that it has put into place at Bagram in the past few months for evaluating the continued detention of individuals. But we will decide this case based on the procedures that have been in place, not on the new procedures that are being implemented only now when the case is before the Court of Appeals.

determinative, for the reasons discussed above, the very fact that it was the subject of much discussion in *Boumediene* makes it obvious that it is not without relevance. As the Supreme Court set forth, Guantanamo Bay is "a territory that, while technically not part of the United States, is under the complete and total control of our Government." 128 S. Ct. at 2262. While it is true that the United States holds a leasehold interest in Bagram, and held a leasehold interest in Guantanamo, the surrounding circumstances are hardly the same. The United States has maintained its total control of Guantanamo Bay for over a century, even in the face of a hostile government maintaining *de jure* sovereignty over the property. In Bagram, while the United States has options as to duration of the lease agreement, there is no indication of any intent to occupy the base with permanence, nor is there hostility on the part of the "host" country. Therefore, the notion that *de facto* sovereignty extends to Bagram is no more real than would have been the same claim with respect to Landsberg in the *Eisentrager* case. While it is certainly realistic to assert that the United States has *de facto* sovereignty over Guantanamo, the same simply is not true with respect to Bagram. Though the site of detention analysis weighs in favor of the United States and against the petitioners, it is not determinative.

But we hold that the third factor, that is "the practical obstacles inherent in resolving the prisoner's entitlement to the writ," particularly when considered along with the second factor, weighs overwhelmingly in favor of the position of the United States. It is undisputed that Bagram, indeed the entire nation of Afghanistan, remains a theater of war. Not only does this suggest that the detention at Bagram is more like the detention at Landsberg than Guantanamo, the position of the United States is even stronger in this case than it was in *Eisentrager*. As the Supreme Court recognized in *Boumediene*, even though the active hostilities in the European theater had "c[o]me to an end,"

at the time of the *Eisentrager* decision, many of the problems of a theater of war remained:

> In addition to supervising massive reconstruction and aid efforts the American forces stationed in Germany faced potential security threats from a defeated enemy. In retrospect the post-War occupation may seem uneventful. But at the time *Eisentrager* was decided, the Court was right to be concerned about judicial interference with the military's efforts to contain "enemy elements, guerilla fighters, and 'were-wolves.'"

128 S. Ct. at 2261 (quoting *Eisentrager*, 339 U.S. at 784).

In ruling for the extension of the writ to Guantanamo, the Supreme Court expressly noted that "[s]imilar threats are not apparent here." 128 S. Ct. at 2261. In the case before us, similar, if not greater, threats are indeed apparent. The United States asserts, and petitioners cannot credibly dispute, that all of the attributes of a facility exposed to the vagaries of war are present in Bagram. The Supreme Court expressly stated in *Boumediene* that at Guantanamo, "[w]hile obligated to abide by the terms of the lease, the United States is, for all practical purposes, answerable to no other sovereign for its acts on the base. Were that not the case, *or if the detention facility were located in an active theater of war*, arguments that issuing the writ would be 'impractical or anomalous' would have more weight." *Id.* at 2261-62 (emphasis added). Indeed, the Supreme Court supported this proposition with reference to the separate opinion of Justice Harlan in *Reid*, where the Justice expressed his doubts that "every provision of the Constitution must always be deemed automatically applicable to United States citizens in every part of the world." *See* 354 U.S. at 74 (Harlan, J., concurring in the result). We therefore conclude that under both *Eisentrager* and *Boumediene*, the writ does not extend to the

Bagram confinement in an active theater of war in a territory under neither the *de facto* nor *de jure* sovereignty of the United States and within the territory of another *de jure* sovereign.

We are supported in this conclusion by the rationale of *Eisentrager*, which was not only not overruled, but reinforced by the language and reasoning just referenced from *Boumediene*. As we referenced in the background discussion of this opinion, we set forth more fully now concerns expressed by the Supreme Court in reaching its decision in *Eisentrager*:

> Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

*Eisentrager*, 339 U.S. at 779. Those factors are more relevant to the situation at Bagram than they were at Landsberg. While it is true, as the Supreme Court noted in *Boumediene*, that the United States forces in Germany in 1950 faced the possibility of unrest and guerilla warfare, operations in the European theater had ended with the surrender of Germany and Italy years earlier. Bagram remains in a theater of war. We cannot, consistent with *Eisentrager* as elucidated by *Boumediene*, hold that the right to the writ of habeas corpus and the constitutional protections of the Suspension Clause extend to Bagram detention facility in

Afghanistan, and we therefore must reverse the decision of the district court denying the motion of the United States to dismiss the petitions.

We do not ignore the arguments of the detainees that the United States chose the place of detention and might be able "to evade judicial review of Executive detention decisions by transferring detainees into active conflict zones, thereby granting the Executive the power to switch the Constitution on or off at will." Brief of Appellees at 34 (quotation marks and citation omitted). However, that is not what happened here. Indeed, without dismissing the legitimacy or sincerity of appellees' concerns, we doubt that this fact goes to either the second or third of the Supreme Court's enumerated factors. We need make no determination on the importance of this possibility, given that it remains only a possibility; its resolution can await a case in which the claim is a reality rather than a speculation. In so stating, we note that the Supreme Court did not dictate that the three enumerated factors are exhaustive. It only told us that "*at least* three factors" are relevant. *Boumediene*, 128 S. Ct. at 2259 (emphasis added). Perhaps such manipulation by the Executive might constitute an additional factor in some case in which it is in fact present. However, the notion that the United States deliberately confined the detainees in the theater of war rather than at, for example, Guantanamo, is not only unsupported by the evidence, it is not supported by reason. To have made such a deliberate decision to "turn off the Constitution" would have required the military commanders or other Executive officials making the situs determination to anticipate the complex litigation history set forth above and predict the *Boumediene* decision long before it came down.

Also supportive of our decision that the third factor weighs heavily in favor of the United States, as the district court recognized, is the fact that the detention is within the sovereign

territory of another nation, which itself creates practical difficulties. Indeed, it was on this factor that the district court relied in dismissing the fourth petition, which was filed by an Afghan citizen detainee. *Al Maqaleh*, 604 F. Supp. 2d at 229-30, 235. While that factor certainly weighed more heavily with respect to an Afghan citizen, it is not without force with respect to detainees who are alien to both the United States and Afghanistan. The United States holds the detainees pursuant to a cooperative arrangement with Afghanistan on territory as to which Afghanistan is sovereign. While we cannot say that extending our constitutional protections to the detainees would be in any way disruptive of that relationship, neither can we say with certainty what the reaction of the Afghan government would be.

In sum, taken together, the second and especially the third factors compel us to hold that the petitions should have been dismissed.

## CONCLUSION

For the reasons set forth above, we hold that the jurisdiction of the courts to afford the right to habeas relief and the protection of the Suspension Clause does not extend to aliens held in Executive detention in the Bagram detention facility in the Afghan theater of war. We therefore reverse the order of the district court denying the motion for dismissal of the United States and order that the petitions be dismissed for lack of jurisdiction.

*So ordered.*