# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued January 13, 2011                    Decided June 21, 2011

No. 07-5178

ARKAN MOHAMMED ALI ET AL.,
APPELLANTS

v.

DONALD H. RUMSFELD, INDIVIDUALLY, ET AL.,
APPELLEES

———

Consolidated with 07-5185, 07-5186, 07-5187

———

Appeals from the United States District Court
for the District of Columbia
(No. 05cv01378)

———

*Cecillia D. Wang* argued the cause for the appellants. *Lucas Guttentag*, *Jennifer Chang Newell*, *Kate Desormeau*, *Steven R. Shapiro*, *Paul Hoffman*, *James P. Cullen*, *Bill Lann Lee*, *Arthur B. Spitzer*, *David Rudovsky* and *Erwin Chemerinsky* were on brief.

*Stephen A. Saltzburg* was on brief for *amici curiae* National Institute of Military Justice et al. in support of the appellants.

*William J. Aceves* was on brief for *amici curiae* Human Rights & Torture Treatment Organizations in support of the appellants.

*Robert M. Loeb*, Attorney, United States Department of Justice, argued the cause for the appellees. *Barbara L. Herwig*, *Michael L. Martinez*, *Mark E. Nagle*, *Stephen L. Braga* and *Ryan E. Bull*, Attorneys, were on brief.

Before: SENTELLE, *Chief Judge*, HENDERSON, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

Dissenting opinion filed by *Senior Circuit Judge* EDWARDS.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Four Afghan and five Iraqi citizens captured and subsequently held in Afghanistan and Iraq, respectively, by the United States military sued Donald Rumsfeld, former Secretary of the United States Department of Defense, and three high-ranking Army officers[1] (collectively, defendants) under the Fifth and Eighth Amendments to the United States Constitution, the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and the Third and Fourth Geneva Conventions, 6 U.S.T. 3316 and 6 U.S.T. 3516, seeking damages and declaratory relief as the result of their treatment while in U.S. custody. The district court granted the defendants' motion to dismiss all six claims and the plaintiffs appeal the dismissal of their constitutional and ATS claims only. For the reasons set forth below, we affirm the district court's judgment.

---

[1] Army Lieutenant General Ricardo Sanchez, commander of the "Coalition Joint Task Force-7" from June 2003 to July 2004 and "the highest-ranking U.S. military official in Iraq," Am. Compl. ¶ 28; Janis Karpinski, commander of the "800th Military Police Brigade," which was responsible for detention facilities in Iraq, from approximately June 2003 to May 2004; and Colonel Thomas Pappas, commander of the "205th Military Intelligence Brigade" who in November 2003 assumed command of the "Joint Interrogation and Debriefing Center" at Abu Ghraib prison near Baghdad, Iraq. *Id*. ¶¶ 29-30.

3

**I.**

The amended complaint alleges the following facts. Arkan Mohammed Ali is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for almost one year, from approximately July 2003 to June 2004. Am. Compl. ¶ 17. He alleges he was beaten to the point of unconsciousness; stabbed and mutilated; stripped naked, hooded and confined in a wooden phone booth-sized box; subjected to prolonged sleep deprivation enforced by beatings; deprived of adequate food and water and subjected to mock execution and death threats. *Id.* Thahe Mohammed Sabar is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for about six months from approximately July 2003 to January 2004. *Id.* ¶ 18. He alleges he was severely beaten, sexually assaulted and humiliated, deprived of adequate food and water, intentionally exposed to dangerously high temperatures for prolonged periods and subjected to mock executions and death threats. *Id.* Sherzad Kamal Khalid is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for about two months from approximately July 2003 through September 2003. *Id.* ¶ 19. He alleges he was frequently and severely beaten, sexually assaulted and threatened with anal rape, deprived of adequate food and water, intentionally exposed to dangerously high temperatures and subjected to "mock executions, death threats . . . and prolonged sleep deprivation enforced by beatings." *Id.* Ali H. is an Iraqi citizen who was held at Abu Ghraib and other military facilities in Iraq for about four weeks from August to September 2003. *Id.* ¶ 20. He alleges the U.S. military intentionally withheld and delayed necessary medical treatment, intentionally inflicted "pain after surgery by dragging him from one location to another and forcefully ripping away the surgical dressing," intentionally exposed him to infection by leaving his surgical wound half-bandaged and deprived him of adequate food and water. *Id.* Najeeb Abbas Ahmed is an Iraqi citizen who was held at Abu Ghraib and other military facilities

in Iraq for two separate periods, the first from approximately May 2003 to July 2003 and the second from approximately July 2003 through December 2003. *Id.* ¶ 21. He alleges U.S. soldiers held a gun to his head, threatened him with death and with life imprisonment at Guantanamo Bay, sexually assaulted him, stepped and sat on his body while he was in extreme restraints, humiliated him by chanting racial epithets while videotaping and photographing him, held him in an outdoor cage at temperatures exceeding approximately 120 degrees Fahrenheit, intentionally deprived him of sleep for prolonged periods, confiscated medication for his high blood pressure and heart disease and intentionally deprived him of medical care after he "suffered more than one heart attack and a possible stroke in detention." *Id.* Mehboob Ahmad is a citizen of Afghanistan who was held by the U.S. military at the detention facility located at Bagram Air Force Base (Bagram) and at other military facilities in Afghanistan for approximately five months from June to November 2003. *Id.* ¶ 22. He alleges U.S. soldiers placed him in restraints and positions calculated to cause pain, intimidated him with a vicious dog, questioned him while he was naked, threatened his family and subjected him to sensory deprivation. *Id.* Said Nabi Siddiqi is a citizen of Afghanistan who was also held at military facilities in Afghanistan, including Bagram and the Kandahar detention facility, from July to August 2003. *Id.* ¶ 23. He alleges he was beaten, placed in restraints and positions calculated to cause pain, subjected to "verbal abuse of a sexual nature," humiliated by being photographed naked, denied water, intentionally deprived of necessary medication, intentionally exposed to dangerous temperatures for prolonged periods and deprived of sleep. *Id.* Mohammed Karim Shirullah is a citizen of Afghanistan who was held at Bagram and other military facilities in Afghanistan for approximately six months, from December 2003 to June 2004. *Id.* ¶ 24. He alleges he was beaten, placed in restraints and positions calculated to cause pain, interrogated and

photographed while naked, subjected to sensory deprivation and placed in solitary confinement for an extended period, denied medical care for injuries caused by abuse, intentionally exposed to extreme temperatures for prolonged periods, doused with cold water and deprived of sleep. *Id.* Haji Abdul Rahman is a citizen of Afghanistan who was held at Bagram and other military facilities in Afghanistan for approximately five months, from December 2003 to May 2004. *Id.* ¶ 25. He alleges he was questioned and photographed while naked, subjected to complete sensory deprivation for twenty-four hours, placed in solitary confinement and deprived of sleep. *Id.*

The plaintiffs originally filed separate actions in four different jurisdictions—the District of Connecticut, the Northern District of Illinois, the District of South Carolina and the Southern District of Texas. By an order dated June 17, 2005, the Judicial Panel on Multidistrict Litigation transferred the cases to the district court of the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407. The plaintiffs filed an amended complaint on January 5, 2006. They allege the defendants:

> (1) formulated or implemented policies and practices that caused the torture and other cruel, inhuman or degrading treatment of Plaintiffs; and (2) had effective command and control of U.S. military personnel in Iraq and/or Afghanistan and knew and had reason to know of torture and abuse by their subordinates and failed to promptly and effectively prohibit, prevent and punish unlawful conduct.

*Id.* ¶ 26. The plaintiffs asserted six causes of action in the district court; five asserted claims for violations of (1) the Due Process Clause of the Fifth Amendment, (2) the Fifth Amendment and Eighth Amendment prohibitions against cruel and unusual punishment, (3) the law of nations prohibition against torture, (4) the law of nations prohibition against cruel,

inhuman or degrading treatment and (5) the Geneva Conventions. Am. Compl. ¶¶ 235-59. The sixth cause of action sought a declaratory judgment that defendant Rumsfeld violated "the law of nations, binding treaties and the U.S. Constitution." *Id.* ¶¶ 260-63. In March 2006, the defendants moved to dismiss the amended complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (FRCP) for lack of subject matter jurisdiction and failure to state claims upon which relief may be granted.[2]

On March 27, 2007, the district court dismissed the plaintiffs' amended complaint pursuant to FRCP 12(b)(1) and 12(b)(6) "and on the ground that the defendants are entitled to qualified immunity." *In re Iraq & Afghanistan Detainees Litig.* (*Detainees Litig.*), 479 F. Supp. 2d 85, 119 (D.D.C. 2007). Regarding the constitutional claims brought pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971),[3] the district court held the Fifth and Eighth Amendments do not apply to "nonresident aliens who were injured extraterritorially while detained by the military in

---

[2] Additionally, defendants Karpinski and Sanchez argued the plaintiffs' claims raise nonjusticiable political questions and defendant Pappas argued the constitutional claims against him should be dismissed because the plaintiffs' allegations failed to connect him to the alleged constitutional violations and all claims against him should be dismissed for lack of personal jurisdiction. Because it dismissed the plaintiffs' cases on other grounds, the district court considered these arguments moot.

[3] "The holding in *Bivens* permits a plaintiff to bring an action in federal court against a federal officer/employee for the violation of his constitutional rights. 403 U.S. at 389. A *Bivens* suit is the federal counterpart of a claim brought pursuant to 42 U.S.C. § 1983 against a state or local officer/employee for the violation of the claimant's constitutional rights." *Rasul v. Myers*, 512 F.3d 644, 652 n.2 (D.C. Cir.), *vacated*, 129 S. Ct. 763 (2008).

foreign countries where the United States is engaged in wars."[4] *Detainees Litig.*, 479 F. Supp. 2d at 95. The court relied on the United States Supreme Court's holdings in *Johnson v. Eisentrager*, 339 U.S. 763 (1950), and *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), and *Zadvydas v. Davis*, 533 U.S. 678 (2001), and on our holding in *Boumediene v. Bush*, 476 F.3d 981 (D.C. Cir. 2007), *rev'd*, 553 U.S. 723 (2008).[5] The court

---

[4] The district court also held that the plaintiffs' Eighth Amendment claim failed "not only because the plaintiffs are precluded from invoking the Constitution . . . , but also because the Eighth Amendment applies only to convicted criminals" and the plaintiffs "were never convicted of a crime." 479 F. Supp. 2d at 103 (citing *Ingraham v. Wright*, 430 U.S. 651, 664 (1977)). On appeal the plaintiffs contend their Eighth Amendment claim is cognizable. Because we affirm the district court's dismissal of the Eighth Amendment claim on other grounds, we do not reach this argument.

[5] In *Eisentrager*, the Supreme Court held that German nationals who were imprisoned at a U.S. army base in Germany and convicted of war crimes committed during World War II had no habeas corpus right under the U.S. Constitution. In *Verdugo-Urquidez*, the Court held that a Mexican citizen whose residence in Mexico was searched by agents of the United States Drug Enforcement Administration could not assert a claim under the Fourth Amendment to the U.S. Constitution. The Court explained that it had "rejected the claim that aliens are entitled to Fifth Amendment rights outside the sovereign territory of the United States" and described holdings such as *Plyler v. Doe*, 457 U.S. 202, 210-12 (1982) (illegal aliens residing in United States protected by Equal Protection Clause), and *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (resident alien "person" within meaning of Fifth Amendment), and *Bridges v. Wixon*, 326 U.S. 135, 148 (1945) (resident aliens have First Amendment rights), and *Russian Volunteer Fleet v. United States*, 282 U.S. 481, 489 (1931) (foreign corporation doing business in America entitled to just compensation under Fifth Amendment for property taken by U.S. government), and *Wong Wing v. United States*, 163 U.S. 228, 238 (1896) (resident aliens

further held that even if the plaintiffs could claim constitutional protections, special factors would counsel against inferring a *Bivens* remedy. *Detainees Litig.*, 479 F. Supp. 2d at 103-07. It explained "that military affairs, foreign relations, and national security are constitutionally committed to" the President and the Congress and concluded "that authorizing monetary damages remedies against military officials engaged in an active war would . . . obstruct the Armed Forces' ability to act decisively and without hesitation in defense of our liberty and national

---

entitled to Fifth and Sixth Amendment rights), and *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) (Fourteenth Amendment protects resident aliens), as "establish[ing] only that aliens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country." 494 U.S. at 269, 271. In *Zadvydas*, the Court reaffirmed the constitutional distinction between persons present in the United States and persons outside the United States. The Court held that a federal statute authorizing the Government to hold an alien who has been ordered deported beyond the 90-day "removal period" within which the alien is to be deported permits the Government to hold the alien for only a "reasonable time." 533 U.S. at 682. The Court explained the statute would "raise serious constitutional concerns" if it allowed the Government to hold indefinitely a deportable alien present in the United States, *id.*, but reiterated "that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders," relying on *Eisentrager* and *Verdugo-Urquidez*. 533 U.S. at 693. In *Boumediene*, we held that both Supreme Court and our own precedent "hold[] that the Constitution does not confer rights on aliens without property or presence within the United States." 476 F.3d at 991. The Supreme Court reversed our decision in *Boumediene* and held, for the first time, that alien detainees held at Guantanamo Bay, Cuba, can assert a habeas corpus right under the Suspension Clause of the U.S. Constitution. 553 U.S. 723; *see* U.S. Const. art. I, § 9, cl. 2 (Suspension Clause). As set forth *infra* p. 11-17, we distinguish the Supreme Court's *Boumediene* decision.

interests." *Id.* at 107, 105. Finally, the district court held that qualified immunity protected the defendants from the *Bivens* claims because, even if the plaintiffs possess constitutional rights, "those rights were not clearly established at the time the alleged injurious conduct occurred." *Id.* at 108.

As to the Geneva Conventions claims and the alleged violations of the law of nations brought pursuant to the ATS,[6] the district court held that "the defendants are entitled to absolute immunity pursuant to the Westfall Act," according to which Act the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, 2671 *et seq.*, provides the exclusive remedy for a tort committed by a federal official or employee within the scope of his employment.[7] 479 F. Supp. 2d at 114. The court concluded the Westfall Act includes an intentional tort, *id.* at 110-11, and,

---

[6] The ATS provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350.

[7] The Federal Employees Liability Reform and Tort Compensation Act of 1988, Pub. L. No. 100-694, 102 Stat. 4563 (amending 28 U.S.C. §§ 2671, 2674, 2679), commonly referred to as the Westfall Act, provides in pertinent part:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). The Westfall Act makes the FTCA remedy "exclusive of any other civil action or proceeding for money damages." *Id.* § 2679(b)(1).

relying on the Restatement (Second) of Agency § 228 (1958),[8] determined the defendants acted within the scope of their employment because "detaining and interrogating enemy aliens" was "incidental to their overall military obligations." *Id.* at 114. The court further ruled that neither the ATS claims nor the Geneva Conventions claims fell within one of the statutory exceptions to the Westfall Act. *Id.* at 111-13. Accordingly, the court substituted the United States as the defendant on the ATS and Geneva Conventions claims and then dismissed those claims because the plaintiffs failed to exhaust their administrative remedies as required by the FTCA. *Id.* at 114-15.

The district court rejected the plaintiffs' allegation that Geneva Convention IV itself provides a private cause of action and dismissed their claims for violations of the Convention for failure to state a claim for relief. *Id.* at 115-17. Regarding their claim for declaratory relief, the court held the plaintiffs lacked standing because the named defendants no longer held their official positions in Iraq or Afghanistan and therefore the plaintiffs could not show "that they face a real and imminent threat of being wronged again in the future" by those

---

[8] The Restatement (Second) of Agency § 228 (1958) provides in part:

(1) Conduct of a servant is within the scope of employment if, but only if:

(a) it is of the kind he is employed to perform;

(b) it occurs substantially within the authorized time and space limits;

(c) it is actuated, at least in part, by a purpose to serve the master, and

(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

defendants. *Id.* at 118. Additionally, the court held the plaintiffs, having sued the defendants in their individual capacities only, could not seek declaratory relief.[9] *Id.* at 118-19.

The plaintiffs timely filed a notice of appeal on May 24, 2007, challenging the district court's dismissal of their constitutional and ATS claims and its dismissal of their claim for declaratory relief. They do not appeal the dismissal of their Geneva Conventions claims.

## II.

In reviewing the district court's grant of a motion to dismiss, we accept as true the factual allegations of the plaintiffs' complaint and review the district court's legal conclusions de novo. *Daniels v. Union Pac. R.R. Co.*, 530 F.3d 936, 940 (D.C. Cir. 2008) ("We review the district court's legal conclusions *de novo* . . . [and] accept as true the facts that [the plaintiffs] allege[] in [their] complaint in reviewing the district court's disposition of the defendants' motion to dismiss." (alterations in original) (internal quotation marks omitted)). We address *seriatim* the plaintiffs' constitutional claims, their ATS claims and their claim for declaratory relief.

### A. The *Bivens* Claims

Each plaintiff asserts two *Bivens* claims, namely, the defendants tortured him in violation of his due process right under the Fifth Amendment and the defendants' conduct constituted cruel and unusual punishment in violation of the Eighth Amendment.[10] Am. Compl. ¶¶ 235-46. Our decisions in

---

[9] The court apparently overlooked the fact that the plaintiffs sued defendant Rumsfeld in both his individual and official capacities. *See* Am. Compl. ¶ 27.

[10] The second claim also alleges the defendants' conduct constituted cruel and unusual punishment in violation of the Fifth

*Rasul v. Myers* (*Rasul I*), 512 F.3d 644 (D.C. Cir.), *vacated*, 129 S. Ct. 763 (2008), and *Rasul v. Myers* (*Rasul II*), 563 F.3d 527 (D.C. Cir.) (per curiam), *cert. denied*, 130 S. Ct. 1013 (2009), govern our resolution of these claims.

In *Rasul I*, four British citizens sued Secretary Rumsfeld and several high-ranking military officials for damages arising from their alleged illegal detention and torture at Guantanamo Bay, Cuba between 2002 and 2004. *Rasul I*, 512 F.3d at 649-50. Their complaint included claims under the Fifth and Eighth Amendments, the ATS, the Geneva Conventions and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.* We affirmed the district court's dismissal of the constitutional claims, explaining that "Guantanamo detainees lack constitutional rights because they are aliens without property or presence in the United States." 512 F.3d at 663 (citing *Boumediene v. Bush*, 476 F.3d 981, 984 (D.C. Cir. 2007), *rev'd*, 553 U.S. 723 (2008)). Furthermore, we concluded the defendants were protected by qualified immunity because, even assuming *arguendo* the detainees possessed rights under the Fifth and Eighth Amendments, those rights were not clearly established at the time of their detention and alleged torture. *Id.*

---

Amendment. It is unclear, however, how this claim differs from the plaintiffs' first claim that the defendants violated the Fifth Amendment by engaging in torture. Although an individual not yet convicted of a crime must challenge his treatment or the conditions of his confinement under the Due Process Clause of the Fifth or Fourteenth Amendments rather than the Eighth Amendment, *see City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983); *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007), *rev'd on other ground sub nom. Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) (complaint failed to plead sufficient facts to state claim for relief); *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 259 n.1 (7th Cir. 1996), *cert. denied*, 519 U.S. 1109 (1997), he does not create two separate claims under either Due Process Clause by alleging both torture and cruel and unusual punishment.

at 665-67. After *Rasul I* issued, the Supreme Court reversed our *Boumediene* decision and held the Suspension Clause extends to nonresident aliens detained at Guantanamo Bay. *Boumediene v. Bush*, 553 U.S. 723 (2008). The Court then vacated our judgment in *Rasul I* and remanded for further consideration in light of its intervening decision in *Boumediene*. *Rasul v. Myers*, 129 S. Ct. 763 (2008).

On remand, we reaffirmed our holding that the defendants were protected by qualified immunity and explained it was not necessary to determine whether the Fifth and Eighth Amendments applied to the plaintiffs.[11] Qualified immunity shields a government official from civil liability if his conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Even if the *Rasul* plaintiffs could assert rights under the Fifth and Eighth Amendments, we explained, *Boumediene* did not alter the conclusion that those rights were not clearly established at the time of the defendants' challenged conduct. *Rasul II*, 563 F.3d at 529-30. The plaintiffs argue, as did the *Rasul* plaintiffs, that the defendants should have known (that is, a reasonable person would have known) their alleged misconduct violated the Constitution because it "has long been settled that the

---

[11] Another intervening Supreme Court decision—*Pearson v. Callahan*, 129 S. Ct. 808, 815-16, 818 (2009)—held that a court can decide a constitutional right was not clearly established without first deciding whether the right exists. Before *Pearson*, courts followed the *Saucier* procedure, under which they first had to determine whether the alleged facts made out a violation of a constitutional or statutory right before deciding whether the right was clearly established at the time of the alleged violation. *Id.* at 815-16; *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Constitution forbids the torture of any detainee."[12] Appellants' Br. 23; *see Rasul I*, 512 F.3d at 666. The proper inquiry, however, is not whether the Constitution prohibits torture but "whether the rights the plaintiffs press *under the Fifth and Eighth Amendments* were clearly established at the time of the alleged violations." *Rasul I*, 512 F.3d at 666 (emphasis in original). As the Supreme Court made clear in *Boumediene*, it had "never held that noncitizens detained by our Government in territory over which another country maintains *de jure* sovereignty have any rights under our Constitution." 553 U.S. at 770; *see also Rasul II*, 563 F.3d at 530 ("At the time of [the plaintiffs'] detention, neither the Supreme Court nor this court had ever held that aliens captured on foreign soil and detained beyond sovereign U.S. territory had any constitutional rights—under the Fifth Amendment, the Eighth Amendment, or otherwise."). As it was not clearly established in 2004 that the Fifth and Eighth Amendments apply to aliens detained at Guantanamo Bay—where the Supreme Court has since held the Suspension Clause applies—it plainly was not clearly established in 2004 that the Fifth and Eighth Amendments apply to aliens held in Iraq and Afghanistan—where no court has held any constitutional right applies. As we explained in *Rasul II*, the Supreme Court in *Boumediene* "explicitly confined its constitutional holding 'only' to the extraterritorial reach of the Suspension Clause" and "disclaimed any intention to disturb existing law governing the extraterritorial reach of any constitutional provisions, other than the Suspension Clause." 563 F.3d at 529 (quoting *Boumediene*, 553 U.S. at 795). As in

---

[12] The plaintiffs also cite several "military laws, regulations, and training materials" prohibiting torture which, they contend, "reinforce the constitutional prohibition against torture and serve to put military commanders and personnel on notice of the sorts of actions that the Constitution prohibits." Appellants' Br. 24-25.

*Rasul II*, therefore, the defendants here are protected from the plaintiffs' constitutional claims by qualified immunity.[13]

The plaintiffs contend the Supreme Court in *Boumediene* adopted a flexible approach that leaves open the possibility of the extraterritorial application of constitutional provisions other than the Suspension Clause and claim that our decision in *Al Maqaleh v. Gates*, 605 F.3d 84 (D.C. Cir. 2010), accurately interprets *Boumediene*. Because the three alien Bagram detainees in *Al Maqaleh* sought habeas corpus relief, the decision addresses only the applicability of the Suspension Clause. We nonetheless noted that the Supreme Court's *Boumediene* decision "explored the more general question of extension of constitutional rights and the concomitant constitutional restrictions on governmental power exercised extraterritorially and with respect to noncitizens." *Id.* at 93. The court discussed three factors the Supreme Court identified as relevant in determining the reach of the Suspension Clause: "(1) the citizenship and status of the detainee and the adequacy of the process through which that status determination was made; (2) the nature of the sites where apprehension and then detention took place; and (3) the practical obstacles inherent in resolving the prisoner's entitlement to the writ." *Id.* at 94 (quoting *Boumediene*, 553 U.S. at 766). The first factor weighed in favor of extending the habeas corpus right to the three because, like the *Boumediene* detainees, they were aliens held by the American military. *Id.* at 95-96. According to the court, the

---

[13] Even the plaintiffs recognize this and ask us to "abandon [our] holdings to the contrary." Appellants' Br. 23. "That argument is misplaced because we are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court." *United States v. Carson*, 455 F.3d 336, 384 n.43 (D.C. Cir. 2006) (per curiam), *cert. denied*, 549 U.S. 1246 (2007).

three received less due process than the *Boumediene* detainees.[14] *Id.* The second and third factors, however, weighed against them. Distinguishing Guantanamo Bay—where, according to the Supreme Court, the United States has *de facto* sovereignty, *Boumediene*, 553 U.S. at 755—the court concluded "the same simply is not true with respect to Bagram." *Al Maqaleh*, 605 F.3d at 97. The United States has not demonstrated an intent to exercise sovereignty over Bagram "with permanence." *Id.* Moreover, "Bagram, indeed the entire nation of Afghanistan, remains a theater of war." *Id.* The same is true of Iraq. The Supreme Court expressly stated in *Boumediene* that, if Guantanamo Bay "were located in an active theater of war, arguments that issuing the writ would be 'impractical or anomalous' would have more weight." 553 U.S. at 770. We concluded "that under both *Eisentrager* and *Boumediene*, the [habeas corpus] writ does not extend to the Bagram confinement in an active theater of war in a territory under neither the *de facto* nor *de jure* sovereignty of the United States and within the territory of another *de jure* sovereign." *Al Maqaleh*, 605 F.3d at 98. Thus, even under the plaintiffs' view of *Boumediene*, we have nonetheless held that the Suspension Clause does not apply to Bagram detainees. They offer no reason—and we see none

---

[14] The *Al Maqaleh* detainees' status was reviewed by the Unlawful Enemy Combatant Review Board (UECRB), not the Combatant Status Review Tribunal (CSRT) that reviewed the *Boumediene* detainees' status. 605 F.3d at 96. According to the court, "proceedings before the UECRB afford[ed] even less protection to the rights of detainees in the determination of status than was the case with the CSRT." *Id.* The *Al Maqaleh* detainees had no representation while the *Boumediene* detainees had "personal representative[s]." *Al Maqaleh v. Gates*, 604 F. Supp. 2d 205, 227 (D.D.C. 2009), *rev'd*, 605 F.3d 84 (D.C. Cir. 2010). Additionally, the *Al Maqaleh* detainees were not permitted to speak in their defense but could submit only a written statement and were not informed of the evidence against them so that they lacked a meaningful opportunity to rebut the evidence. *Id.*

ourselves—why the plaintiffs' Fifth and Eighth Amendment claims would be any stronger than the Suspension Clause claims of the Bagram detainees.

The plaintiffs urge us to follow the now-optional *Saucier* procedure and decide, first, whether they have "alleged a deprivation of a constitutional right at all," *Pearson*, 129 S. Ct. at 816 (internal quotation marks omitted), although we may ultimately conclude any such right was not clearly established at the time of the defendants' alleged misconduct.[15] The *Saucier* procedure, however, is not appropriate in most cases. Often "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right." *Id.* In such a case, deciding the existence of the constitutional right *vel non* is "an essentially academic exercise," *id.*, that "runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable," *id.* at 821 (ellipsis in original) (internal quotation marks and citations omitted), and results in the "substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case," *id.* at 818. The *Saucier* approach can also preclude an affected party from obtaining appellate review of a decision that could significantly affect its

---

[15] We recognize that the *Saucier* approach is "often beneficial" and helps "promote[] the development of constitutional precedent." *Pearson*, 129 S. Ct. at 818; *see also Camreta v. Greene*, 131 S. Ct. 2020, 2032 (2011). As the Supreme Court explained, in some cases "there would be little if any conservation of judicial resources to be had" by deciding only the "clearly established" prong. *Pearson*, 129 S. Ct. at 818. For instance, it sometimes can be "difficult to decide whether a right is clearly established without deciding precisely what the constitutional right happens to be." *Id.* (quotation marks and citation omitted). In other cases, the explanation that a right was not clearly established "may make it apparent that [the allegations] do not make out a constitutional violation at all." *Id.*

future actions. *Id.* at 820. If a court decides that the defendant violated the plaintiff's constitutional right but is entitled to qualified immunity because the right was not clearly established at the time, the "prevailing" defendant presumably would not be able to appeal the adverse constitutional holding. *Id.* (citing *Kalka v. Hawk*, 215 F.3d 90, 96 n.9 (D.C. Cir. 2000) ("Normally, a party may not appeal from a favorable judgment.")); *cf. Camreta v. Greene*, 131 S. Ct. 2020, 2028-33 (2011) (official who prevails on qualified immunity in district court may not be able to obtain appellate review, notwithstanding availability of certiorari review to official who prevails on qualified immunity on appeal). As in *Rasul II*, we believe "[c]onsiderations of judicial restraint favor exercising the *Pearson* option with regard to [the] plaintiffs' *Bivens* claims." 563 F.3d at 530.

In *Rasul II* we had an alternative basis—apart from qualified immunity—on which to dismiss the plaintiffs' *Bivens* claims—that "federal courts cannot fashion a *Bivens* action when 'special factors' counsel against doing so." 563 F.3d at 532 n.5. We determined the "danger of obstructing U.S. national security policy is one such factor" that counsels against allowing a *Bivens* claim to proceed.[16] *Id.* The same rationale applies here.[17] The district court correctly concluded that allowing a *Bivens* action to be brought against American military officials engaged in war would disrupt and hinder the ability of our armed forces "to act decisively and without hesitation in defense of our liberty and national interests."

---

[16] We concluded that this alternative rationale was "also unaffected by the Supreme Court's *Boumediene* decision." 563 F.3d at 532 n.5.

[17] Again, the plaintiffs urge us to "abandon" our holding in *Rasul II* on this point as well. Appellants' Br. 35.

*Detainees Litig.*, 479 F. Supp. 2d at 105. The Supreme Court long ago recognized as much in *Eisentrager*:

> Such trials would hamper the war effort and bring aid and comfort to the enemy. They would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home. Nor is it unlikely that the result of such enemy litigiousness would be a conflict between judicial and military opinion highly comforting to enemies of the United States.

339 U.S. 763, 779 (1950). And in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 209 (D.C. Cir. 1985), our court noted that "the special needs of foreign affairs must stay our hand in the creation of damage remedies against military and foreign policy officials for allegedly unconstitutional treatment of foreign subjects causing injury abroad." In *Sanchez-Espinoza*, Nicaraguan citizens, none of whom resided in the United States, sued, *inter alia*, the President, the CIA director, the then-current as well as former secretaries of state and the then-secretary of defense alleging they had "authorized, financed, trained, directed and knowingly provided substantial assistance" to Nicaraguan rebels who engaged in "summary execution, murder, abduction, torture, rape, wounding, and the destruction of private property and public facilities." *Id.* at 205 (quoting Am. Compl. ¶¶ 31, 81). We concluded that "the danger of foreign citizens' using the courts in [such situation] to obstruct the foreign policy of our government is sufficiently acute that we must leave to Congress the judgment whether a damage remedy should exist." *Id.* at 209. As in *Rasul II*, we see no

basis for distinguishing this case from *Sanchez-Espinoza*. Accordingly, even if the defendants were not shielded by qualified immunity and the plaintiffs could claim the protections of the Fifth and Eighth Amendments, we would decline to sanction a *Bivens* cause of action because special factors counsel against doing so.

## B. The ATS Claims

*Rasul II* also governs our resolution of the plaintiffs' ATS claims alleging violations of the law of nations. In addition to their *Bivens* claims, the *Rasul* plaintiffs "brought three claims for violations of the law of nations pursuant to the [ATS] based on the defendants' alleged infliction of 'prolonged arbitrary detention,' 'torture,' and 'cruel, inhuman or degrading treatment.' "[18] *Rasul I*, 512 F.3d at 654 (citations omitted). We determined the defendants' alleged tortious conduct—"the detention and interrogation of suspected enemy combatants"—was "incidental to [their] legitimate employment duties" because it was "the type of conduct the defendants were employed to engage in." *Id.* at 658-59. Because the defendants had acted within the scope of their employment, we held the ATS claims "were properly restyled as claims against the United States that are governed by the FTCA" and upheld their dismissal for failure to exhaust administrative remedies.[19] *Id.* at

---

[18] Specifically, the *Rasul* plaintiffs alleged "they were beaten, shackled in painful stress positions, threatened by dogs, subjected to extreme temperatures and deprived of adequate sleep, food, sanitation, medical care and communication." *Rasul I*, 512 F.3d at 654.

[19] In *Rasul II*, we stated that we could "see nothing in the Supreme Court's [*Boumediene*] decision that could possibly affect our disposition of" the plaintiffs' ATS claims alleging violations of the law of nations and "therefore reinstate[d] our judgment" with respect to those claims. 563 F.3d at 528-29. The portion of *Rasul I* that treats the ATS claims, therefore, remains controlling law.

660-61 (internal quotation marks and brackets omitted). The plaintiffs here bring similar claims against similar (and, in the case of defendant Rumsfeld, identical) defendants. And like the *Rasul* defendants who, we held, were acting within the scope of their employment, the defendants here—who engaged in the same conduct—were acting within the scope of their employment as well. *See id.* at 654-61. The plaintiffs argue the Westfall Act does not cover "egregious torts that violate *jus cogens* norms" because the Act grants immunity for a " 'negligent or wrongful act or omission' " only. Appellants' Br. 46 (quoting 28 U.S.C. § 2679(b)(1)). The plaintiffs argue "wrongful" is ambiguous and should be interpreted in light of the Act's legislative history which, the plaintiffs contend, reveals "wrongful" was not intended to encompass egregious torts that violate *jus cogens* norms. We explicitly rejected this argument in *Rasul I*, where, while acknowledging the plaintiffs had "plainly alleged 'seriously criminal' conduct," we explained that "the allegations of serious criminality do not alter our conclusion that the defendants' conduct was incidental to authorized conduct." 512 F.3d at 659-60. Accordingly, the district court correctly held that the Westfall Act applied and correctly substituted the United States as the defendant under the FTCA.[20] The FTCA "required the plaintiffs to file an

---

[20] The plaintiffs also challenge the district court's holding that the defendants acted within the scope of their employment. They contend that, "[a]s a matter of law, torture can never fall within the scope of employment of the U.S. Secretary of Defense and high-ranking U.S. Army commanders." Appellants' Br. 56. They nonetheless recognize the district court's ruling is mandated by our precedent and "maintain the issue here [only] to preserve it." *Id.* They "respectfully submit that this Court's decisions . . . in *Rasul II* and *Harbury* [*v. Hayden*, 522 F.3d 413 (D.C. Cir. 2008),] are not well-founded and should be reconsidered." *Id.* at 57. We are of course bound by circuit precedent. *United States v. Carson*, 455 F.3d 336, 384 n.43 (D.C. Cir. 2006) (per curiam) ("[W]e are . . . bound to follow circuit precedent absent

administrative claim with either the Department of Defense (DoD) or the appropriate military department before bringing suit." *Id.* at 661 (citing 28 C.F.R. § 14.1). "[W]e view the failure to exhaust administrative remedies as jurisdictional." *Id.* As in *Rasul*, the "record is devoid . . . of any suggestion" the plaintiffs filed an administrative claim with DoD or a military department. *Id.* The district court thus properly dismissed the ATS claims under FRCP 12(b)(1) for lack of subject matter jurisdiction.

The plaintiffs raise one argument not addressed in *Rasul I* or *II*. The Westfall Act does not immunize a federal employee/official from a suit "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). The plaintiffs claim the ATS, under which they brought their claims for violations of the law of nations, is a United States statute that permits a private cause of action against a federal employee/official. Therefore, the plaintiffs contend, their claims fall within an exception to the Westfall Act and they should be permitted to proceed against the individual defendants, not the United States.

The district court in *Rasul I* rejected this argument, explaining that the ATS[21] "is strictly a jurisdictional statute" that "does not confer rights nor does it impose obligations or duties that, if violated, would trigger the Westfall Act's statutory

---

contrary authority from an en banc court or the Supreme Court.").

[21] The district court called it the Alien Tort Claims Act (ATCA), 414 F. Supp. 2d at 37-38, another name for the ATS. *See Estate of Amergi ex rel. Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1356 n.5 (11th Cir. 2010) ("The [ATS] is also known as the Alien Tort Claims Act (ATCA), and the Alien Tort Act (ATA)." (internal quotation marks omitted)).

exception."[22] 414 F. Supp. 2d 26, 37-38 (D.D.C. 2006). The Supreme Court has also rejected a similar argument. In *United States v. Smith*, 499 U.S. 160 (1991), a former Army sergeant and his wife sued the Army doctor who delivered their baby in Italy, alleging the doctor's negligence caused brain damage to the baby. The United States sought to substitute itself as the defendant pursuant to the Gonzalez Act, 10 U.S.C. § 1089, which "provide[d] that in suits against military medical personnel for torts committed within the scope of their employment, the Government is to be substituted as the defendant and the suit is to proceed against the Government under the FTCA." *Smith*, 499 U.S. at 162-63. While the plaintiffs' appeal was pending, the Congress enacted the Westfall Act. The United States then relied on the Westfall Act, rather than the Gonzalez Act, to substitute itself as the defendant and the Supreme Court accordingly considered the Westfall Act's applicability. At the time, two courts of appeals had held that the Gonzalez Act protected "only military medical personnel who commit torts within the United States and not those committing torts abroad." *Id.* at 171. The *Smith* plaintiffs argued their claim was therefore not precluded by the Gonzalez Act and that their claim fell within the statutory exception to the Westfall Act because the Gonzalez Act "authorized" their claim. The Supreme Court rejected the plaintiffs' argument. It explained that it "need not decide whether a tort claim brought under state or foreign law could be deemed authorized by the Gonzalez Act" because the plaintiffs' contention "that a claim for malpractice involves 'a violation of' the Gonzalez Act[]is without merit. Nothing in the Gonzalez Act imposes any obligations or duties of care upon military physicians. Consequently, a physician allegedly committing malpractice

---

[22] We did not reach the issue on appeal because the plaintiffs did not appeal that part of the district court's decision. *See Rasul I*, 512 F.3d at 661 n.11.

under state or foreign law does not 'violate' the Gonzalez Act."
*Id.* at 174.

More importantly, the Supreme Court has clarified that "the ATS is a jurisdictional statute creating no new causes of action." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004); *id.* at 729 ("All Members of the Court agree that § 1350 is only jurisdictional."). Thus, as with the Gonzalez Act, nothing in the ATS "imposes any obligations or duties of care upon" the defendants. *Smith*, 499 U.S. at 174; *accord Bancoult v. McNamara*, 370 F. Supp. 2d 1, 9 (D.D.C. 2004) ("The plain language of [the ATS] . . . does not confer rights nor does it impose obligations or duties that, if violated, would trigger the [Westfall Act's statutory violation] exception."), *aff'd on other grounds*, 445 F.3d 427 (D.C. Cir. 2006) (dismissing complaint on political question ground), *cert. denied*, 549 U.S. 1166 (2007); *Schneider v. Kissinger*, 310 F. Supp. 2d 251, 266-67 (D.D.C. 2004) (dismissing complaint on political question ground but holding, alternatively, that ATS "cannot be violated for purposes of [Westfall Act's statutory violation exception]"), *aff'd on other grounds*, 412 F.3d 190 (D.C. Cir. 2005) (affirming dismissal as political question), *cert. denied*, 547 U.S. 1069 (2006). The plaintiffs ask us to ignore the Supreme Court's *Sosa* decision.[23] We can no more ignore Supreme Court precedent than could the district court. Accordingly, we hold that the plaintiffs' claim under the ATS alleges a violation of the law of nations, not of the ATS, and therefore does not violate a

---

[23] The plaintiffs claim the statutory violation exception language of the Westfall Act is ambiguous and we must therefore look to legislative history to determine its meaning. Because *Sosa* issued after the ATS was enacted, the plaintiffs contend, it "does not shed light on what Congress meant to include in the statutory violation exception." Appellants' Br. 53.

statute of the United States within the meaning of section 2679(b)(2)(B).[24]

---

[24] Although the Supreme Court in *Sosa* stated that "the ATS is a jurisdictional statute creating no new causes of action," it nonetheless concluded "the statute was intended to have practical effect the moment it became law" and explained that the statute's jurisdictional grant "is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time [the ATS was enacted in 1789]." 542 U.S. at 724. The Court recognized only three violations—violation of safe conducts, infringement of the rights of ambassadors and piracy—but assumed that nothing "categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law." *Id.* at 724-25.

At the same time the Court held a new cause of action *could* be recognized under the ATS, however, it cautioned courts against doing so, noting that a "series of reasons argue for judicial caution when considering the kinds of claims that might implement the jurisdiction conferred by the [ATS]." *Id.* at 725. The Court noted that its "general practice has been to look for legislative guidance before exercising innovative authority over substantive law" and stated it "would be remarkable to take a more aggressive role in exercising a jurisdiction that remained largely in shadow for much of the prior two centuries." *Id.* at 726. The Court emphasized "that a decision to create a private right of action is one better left to legislative judgment in the great majority of cases." *Id.* at 727 (citing *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001); *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)). For that reason, the Court found itself "reluctant to infer . . . a private cause of action where the statute does not supply one expressly." *Id.* Additionally, "the potential implications for the foreign relations of the United States of recognizing [a new cause of action under the ATS] should make courts particularly wary of impinging on the discretion of the Legislative and Executive Branches in managing foreign affairs." *Id.*

Notwithstanding *Sosa*'s plain statement that "the ATS is a jurisdictional statute," 542 U.S. at 724, the dissent believes the ATS incorporates the law of nations and that a violation of the law of nations thus constitutes a violation of the ATS sufficient to satisfy the Westfall Act's statutory violation exception. *See* Dissenting Op. at 17-25. The respondent in *Sosa* advanced a similar argument—"that the ATS was intended not simply as a jurisdictional grant, but as authority for the creation of a new cause of action for torts in violation of international law." 542 U.S. at 713. The Supreme Court rejected "that reading [of the ATS as] implausible," explaining that, "[a]s enacted in 1789, the ATS gave the district courts 'cognizance' of certain causes of action, and the term bespoke a grant of jurisdiction, not power to mold substantive law." *Id.* Moreover, the Court noted, the positioning of the ATS "in § 9 of the Judiciary Act, a statute otherwise exclusively concerned with federal-court jurisdiction, is itself support for its strictly jurisdictional nature."[25] *Id.* The Court therefore found it "unsurprising . . . that an authority on the historical origins of the ATS has written that 'section 1350 clearly does not create a statutory cause of action,' and that the contrary suggestion is 'simply frivolous.' " *Id.* (quoting William R. Casto, *The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations*, 18 Conn. L. Rev. 467, 479, 480 (1986)); *see also* Casto, *supra*, at 479 ("The [ATS] is purely jurisdictional, and the first Congress undoubtedly understood this to be the case.").

---

[25] In this respect, the ATS is easily distinguishable from section 301(a) of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C. § 185(a). *See* Dissenting Op. at 24. Section 301(a) is part of an extensive statutory enactment and, although it speaks only to federal jurisdiction, other provisions of the LMRA establish substantive legal duties and rights. *See, e.g.*, 29 U.S.C. §§ 186-87. The ATS, by contrast, is a stand-alone grant of jurisdiction only.

The dissent's citations to *Sosa*—and to *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)—confirm that the ATS is a jurisdictional statute only and that any claim brought under the ATS alleges a violation of the law of nations and the common law, not of the ATS itself. *See* Dissenting Op. at 3-4, 12, 18-19.

The dissent contends that Supreme Court precedent establishing "that the domestic law of the United States recognizes the law of nations," *Sosa*, 542 U.S. at 729-30 (citing cases), "indicates that section 1350 itself effectively incorporates the law of nations," Dissenting Op. at 19. The *Sosa* Court's statement "that the domestic law of the United States recognizes the law of nations," however, is best understood to refer to the common law of the United States, not its statutory law. The most recent precedent the Court cited to support its statement confirms this understanding. *See Sosa*, 542 U.S. at 730 (" '[I]nternational disputes implicating . . . our relations with foreign nations' are one of the 'narrow areas' in which '*federal common law*' continues to exist." (ellipsis in original) (emphasis added) (quoting *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641 (1981))); *see also* Dissenting Op. at 19 (quoting William A. Fletcher, *International Human Rights in American Courts*, 93 Va. L. Rev. 653, 665 (2007)).

*Sosa* unequivocally holds that the ATS is a jurisdictional statute only. *Sosa*, 542 U.S. at 729 ("All Members of the Court agree that § 1350 is only jurisdictional."). A claim brought under the ATS therefore does not allege "a violation of a statute of the United States" satisfying the Westfall Act exception. 28 U.S.C. § 2679(b)(2)(B).

### C. The Declaratory Judgment Claim

The plaintiffs also seek a declaration that the acts alleged in their amended complaint are unlawful and violate the U.S. Constitution, military rules and guidelines and the law of nations. Am. Compl. ¶ 264(a). As discussed *supra*, however,

the plaintiffs have not alleged a cognizable cause of action and therefore have no basis upon which to seek declaratory relief. Nor does the Declaratory Judgment Act (DJA), 28 U.S.C. § 2201, provide a cause of action. It is a "well-established rule that the Declaratory Judgment Act 'is not an independent source of federal jurisdiction.' Rather, 'the availability of [declaratory] relief presupposes the existence of a judicially remediable right.' " *C&E Servs., Inc. of Washington v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002) (quoting *Schilling v. Rogers*, 363 U.S. 666, 677 (1960)); *see also Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950) ("The operation of the Declaratory Judgment Act is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." (internal quotation marks and citation omitted)).

For the foregoing reasons, we affirm the district court's judgment of dismissal.

*So ordered.*

EDWARDS, *Senior Circuit Judge*, dissenting: The plaintiff-appellants in this case allege that they were subjected to acts of torture and abuse while being detained at U.S. military facilities in Afghanistan and Iraq. Each appellant was eventually released without being charged with a crime. Appellants filed suit, alleging civil claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Alien Tort Statute ("section 1350" or "ATS"), 28 U.S.C. § 1350, as well as claims for declaratory relief. Following a motions hearing, the District Court granted the appellees' separate motions to dismiss. *See In re Iraq and Afghanistan Detainees Litig.* ("*Detainees Litig.*"), 479 F. Supp. 2d 85 (D.D.C. 2007). Although I do not disagree with the court's judgment dismissing appellants' *Bivens* claims and their claims for declaratory relief, I dissent from the court's disposition of appellants' claims under section 1350.

Section 1350 says that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations." In my view, the Supreme Court's decision in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), confirms that appellants may pursue a cause of action under section 1350 for deliberate torture perpetrated under color of official authority, and the Westfall Act does not bar these claims. It is ironic that, under the majority's approach, *United States officials* who torture a foreign national in a foreign country are not subject to suit in an action brought under section 1350, whereas *foreign officials* who commit official torture in a foreign country may be sued under section 1350.

\* \* \* \*

The Government's interpretation of *Sosa*, which is endorsed by the majority, is strikingly incomplete. The Government first cites a passage from *Sosa* in which the Court says that the ATS "is a jurisdictional statute creating no new causes of action." Appellees' Br. at 47 (quoting *Sosa*, 542 U.S. at 724). From this, the Government concludes that, "[u]nder *Sosa*, it is indisputable

the ATS is not a federal statute that is capable of being violated." *Id*. at 48.

The Court's decision in *Sosa* is much more nuanced than the Government would have it. And *Sosa* surely does not foreclose actions under the ATS seeking redress for official torture. Rather, contrary to the Government's claims, *Sosa* makes the following critical points:

> All Members of the Court agree that § 1350 is only jurisdictional. We also agree, or at least JUSTICE SCALIA [in his concurrence] does not dispute, that the jurisdiction was originally understood to be available to enforce a small number of international norms that a federal court could properly recognize as within the common law enforceable without further statutory authority.
>
> . . .
>
> Whereas JUSTICE SCALIA sees . . . developments as sufficient to close the door to further independent judicial recognition of actionable international norms, other considerations persuade us that *the judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today*. *Erie* [*Railroad Co. v. Tompkins*, 304 U.S. 64 (1938),] did not in terms bar any judicial recognition of new substantive rules, no matter what the circumstances, and post-*Erie* understanding has identified limited enclaves in which federal courts may derive some substantive law in a common law way.
>
> . . .
>
> We think it would be unreasonable to assume that the First Congress would have expected federal courts to lose all capacity to recognize enforceable international norms simply because the common law might lose some

metaphysical cachet on the road to modern realism. Later Congresses seem to have shared our view. The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980), and for practical purposes the point of today's disagreement has been focused since the exchange between Judge Edwards and Judge Bork in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984). Congress, however, has not only expressed no disagreement with our view of the proper exercise of the judicial power, but has responded to its most notable instance by enacting legislation supplementing the judicial determination in some detail.

542 U.S. at 729-31 (citation omitted) (emphasis added). As this court recently noted in *Saleh v. Titan Corp.*, 580 F.3d 1 (D.C. Cir. 2009), it is clear that *Sosa* "opened the door a crack to the possible recognition of new causes of action under international law (such as, perhaps, torture) if they were firmly grounded on an international consensus." *Id*. at 14.

It is particularly noteworthy that the Supreme Court's opinion in *Sosa* says: "The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980)." 542 U.S. at 731. *Filartiga* held that

deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties. Thus, whenever an alleged torturer is found and served with process by an alien within our borders, § 1350 provides federal jurisdiction.

630 F.2d at 878. The *Filartiga* court construed section 1350 "not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized

by international law." *Id*. at 887; *see also Sosa*, 542 U.S. at 730 (stating that "the Court is bound by the law of nations which is a part of the law of the land") (quoting *The Nereide*, 13 U.S. (9 Cranch) 388, 423 (1815) (Marshall, C.J.)); *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 780 (D.C. Cir. 1984) (Edwards, J., concurring) ("[S]ection 1350 itself provides a right to sue for alleged violations of the law of nations." (footnote omitted)).

*Filartiga* is firm in its holding that "there are few, if any, issues in international law today on which opinion seems to be so united as the limitations on a state's power to torture persons held in its custody." *Id*. at 881. This court recently echoed this view in *Saleh*, noting that "torture committed by a state is recognized as a violation of a settled international norm." 580 F.3d at 15. The Government does not suggest otherwise. So it is clear beyond debate that official torture violates the law of nations.

The fact that the plaintiffs in this case have alleged that *United States officials* committed torture does not counsel against a cause of action under the ATS. The statute does not exclude claims against state actors. And there is no evidence that recent congressional statutes addressing torture and detainee treatment, respectively, intended to preempt suits under section 1350. In fact, there is evidence to the contrary.

Only one question remains: Does the Federal Employees Liability Reform and Tort Compensation Act of 1988 ("Westfall Act"), Pub. L. No. 100-694, 102 Stat. 4563, bar appellants' ATS claims from going forward? After careful consideration of *Sosa* and the case law construing the Westfall Act, I am convinced that the Westfall Act does not bar appellants' claims. An action that is cognizable under section 1350 falls within the Westfall Act's exception for "violation[s] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized," 28 U.S.C. § 2679(b)(2)(B). The Government argues that section 1350 cannot fall within this exception

because the ATS is merely a jurisdictional statute. Appellees' Br. at 47. In my view, *Sosa* requires the opposite conclusion: Appellants' claims arising under section 1350 must fall within the statutory exception to the Westfall Act, because the ATS is a federal statute that incorporates substantive international norms and thereby directly authorizes recovery for deliberate torture perpetrated under color of official authority.

The Government ignores the fact that section 1350, unlike the congressional grant of federal question jurisdiction, "was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations." *Sosa*, 542 U.S. at 731 n.19. "Unlike section 1331, which requires that an action 'arise under' the laws of the United States, section 1350 does not require that the action 'arise under' the law of nations, but only mandates a 'violation of the law of nations' in order to create a cause of action." *Tel-Oren*, 726 F.2d at 779 (Edwards, J., concurring). Section 1350 incorporates the law of nations – including the prohibition against deliberate torture perpetrated under color of official authority – that *can* be "violated" within the meaning of the section 2679(b)(2)(B) exception to the Westfall Act. I therefore conclude that, on the record before us, the District Court has jurisdiction over appellants' complaint alleging official torture and the appellants have a viable cause of action. Consequently, the District Court erred when it dismissed appellants' claims arising under section 1350.

## I. BACKGROUND

### A. The United States Has Consistently and Repeatedly Condemned the Use of Torture

"Torture has long been illegal" in our nation. 151 CONG. REC. 30,756 (2005) (statement of Sen. Graham). Domestically, torture, along with other punishments of "unnecessary cruelty," has been proscribed as a violation of the Eighth Amendment

since the nineteenth century. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citing *Wilkerson v. Utah*, 99 U.S. 130, 136 (1879)). Congress has also prohibited torture that occurs abroad, making such conduct a federal crime punishable by fines and up to 20 years of imprisonment, and even life imprisonment or death should the torture result in a fatality. 18 U.S.C. § 2340A. Congress further created a cause of action against any individual who commits torture "under actual or apparent authority, or color of law, of any foreign nation," regardless of the victim's nationality or the geographic location of the alleged acts. Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (1992) (codified in 28 U.S.C. § 1350 (note)).

Within the context of a military conflict, Congress has declared, in both the Detainee Treatment Act of 2005 ("DTA") and the Military Commissions Act of 2006 ("2006 MCA"), that "[n]o individual in the custody or under the physical control of the United States Government, regardless of nationality or physical location, shall be subject to cruel, inhuman, or degrading treatment or punishment," DTA, Pub. L. No. 109-148, div. A, title X, § 1003(a), 119 Stat. 2680, 2739 (codified at 42 U.S.C. § 2000dd(a)); 2006 MCA, Pub. L. No. 109-366, § 6(c)(1), 120 Stat. 2600, 2635 (codified at 42 U.S.C. § 2000dd-0(1)), and has further prohibited any "treatment or technique of interrogation not authorized by and listed in the United States Army Field Manual on Intelligence Interrogation." DTA, Pub. L. No. 109-148, div. A, title X, § 1002(a), 119 Stat. at 2739 (codified at 10 U.S.C. § 801 (note)). *See also* 18 U.S.C. § 2441 (making war crimes committed by or against a member of the U.S. Armed Forces or a U.S. national punishable by fine, imprisonment, and/or death, regardless of where the crime occurred).

The Executive Branch has been similarly resolute in its prohibition of torture. The United States signed the Convention

Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture") in 1988. In 2000, the U.S. Department of State, with input from the Department of Justice and other federal departments and agencies, submitted its initial compliance report to the United Nations Committee Against Torture, which stated:

> Torture is prohibited by law throughout the United States. It is categorically denounced as a matter of policy and as a tool of state authority. Every act constituting torture under the [United Nations] Convention [Against Torture] constitutes a criminal offence under the law of the United States. No official of the Government, federal, state or local, civilian or military, is authorized to commit or to instruct anyone else to commit torture. Nor may any official condone or tolerate torture in any form. No exceptional circumstances may be invoked as a justification of torture. United States law contains no provision permitting otherwise prohibited acts of torture or other cruel, inhuman or degrading treatment or punishment to be employed on grounds of exigent circumstances (for example, during a "state of public emergency") or on orders from a superior officer or public authority, and the protective mechanisms of an independent judiciary are not subject to suspension. The United States is committed to the full and effective implementation of its obligations under the Convention throughout its territory.

Initial Report of the United States of America to the United Nations Committee Against Torture ¶ 6, U.N. DOC. CAT/C/28/Add.5 (Feb. 9, 2000).

Specifically with regard to military detainees, President George W. Bush, in a statement issued in 2004, affirmed that

> America stands against and will not tolerate torture. . . . American personnel are required to comply with all U.S.

laws, including the United States Constitution, Federal statutes, including statutes prohibiting torture, and our treaty obligations with respect to the treatment of all detainees. . . . Torture is wrong no matter where it occurs, and the United States will continue to lead the fight to eliminate it everywhere.

Statement on United Nations International Day in Support of Victims of Torture, 40 WEEKLY COMP. PRES. DOC. 1167, 1167-68 (June 26, 2004). In 2009, President Barack Obama, through an executive order, instructed that "[detainees] shall in all circumstances be treated humanely and shall not be subjected to violence to life and person (including murder of all kinds, mutilation, cruel treatment, and torture), nor to outrages upon personal dignity (including humiliating and degrading treatment)." Exec. Order No. 13,491, 3 C.F.R. 199, 200 (2009). *See also id.* at 200-01 ("Effective immediately, an individual in the custody or under the effective control of an officer, employee, or other agent of the United States Government, or detained within a facility owned, operated, or controlled by a department or agency of the United States, in any armed conflict, shall not be subjected to any interrogation technique or approach, or any treatment related to interrogation, that is not authorized by and listed in Army Field Manual 2-22.3.").

## B.  Official Torture Violates the Law of Nations

The United States' condemnation of official torture is simply a reflection of a firmly established international norm: Torture perpetrated under color of official authority unequivocally violates the law of nations. Every circuit that has addressed the issue has concluded that official torture violates customary international law. *See, e.g., Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 120 (2d Cir. 2010); *id.* at 155 (Leval, J., concurring in the judgment); *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1250-53 (11th Cir. 2005) (per curiam); *Kadic v. Karadžić*, 70 F.3d 232, 243-44 (2d

Cir. 1995); *Hilao v. Estate of Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994); *Tel-Oren*, 726 F.2d at 788 (Edwards, J., concurring); *id.* at 819-20 (Bork, J., concurring).  Indeed, the Supreme Court in *Sosa* favorably cited the Second Circuit's statement in *Filartiga* that "the torturer has become . . .  an enemy of all mankind."  542 U.S. at 732 (quoting *Filartiga*, 630 F.2d at 890); *see also id.* at 762 (Breyer, J., concurring) ("Today international law will sometimes similarly reflect not only substantive agreement as to certain universally condemned behavior but also procedural agreement that universal jurisdiction exists to prosecute a subset of that behavior.  That subset includes torture, genocide, crimes against humanity, and war crimes." (citation omitted)).

International agreements signed by the United States support the conclusion that torture is a violation of customary international law.  Article 2 of the Convention Against Torture provides that "[e]ach State Party shall take effective legislative, administrative, judicial or other measures to prevent such acts of torture in any territory under its jurisdiction."  Art. II, para. 1, *signed* Apr. 18, 1988, S. TREATY DOC. NO. 100-20, 1465 U.N.T.S. 85; *see also* S. EXEC. REP. NO. 101-30, at 13 (1990) (noting that definition of torture in the Convention Against Torture "correspond[s] to the common understanding of torture as an extreme practice which is universally condemned").  In addition, the Geneva Convention of 1949, art. 3 ("Common Article 3"), prohibits torture "at any time and in any place" in an "armed conflict not of an international character."  *See Hamdan v. Rumsfeld*, 548 U.S. 557, 630 (2006) (explaining that the phrase "conflict not of an international character" was used in contradistinction to Geneva Convention Common Article 2's application to conflicts between nations, such that Common Article 3 applies to the United States' conflict with al Qaeda).  Ever since the Vietnam War – the first war in which the United States had to consider the Geneva Convention's application to prisoners in an insurgency environment – United States military

policy has been to apply Common Article 3 to *all* detainees upon capture. JAMES F. GEBHARDT, THE ROAD TO ABU GHRAIB: US ARMY DETAINEE DOCTRINE AND EXPERIENCE 120 (2005); *see also* William H. Taft, IV, *The Law of Armed Conflict After 9/11: Some Salient Features*, 28 YALE J. INT'L L. 319, 321 (2003) ("Terrorists forfeit any claim to POW status under the laws of armed conflict, but they do not forfeit their right to humane treatment – a right that belongs to all humankind, in war and in peace.").

In sum, there is universal agreement "in the modern usage and practice of nations," *Filartiga*, 630 F.2d at 883, that official torture violates the law of nations. Any court addressing torture does not write on a clean slate.

## II.   ANALYSIS

### A.   Appellants Have a Cause of Action Under Section 1350 To Seek Redress for Official Torture

The Alien Tort Statute, 28 U.S.C. § 1350, reads as follows: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The statute was passed by Congress as part of the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 73, 77, but it was not much cited before the Second Circuit's 1980 decision in *Filartiga. See* 630 F.2d 876 (holding that a cause of action for official torture is cognizable under section 1350). *Filartiga* led to the well-chronicled debate in *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984), between Judge Bork and me about the purpose and scope of section 1350.

In *Tel-Oren*, I argued that section 1350 provided both federal jurisdiction and "a right to sue for alleged violations of the law of nations," *i.e.*, customary international law. *Id.* at 780. I went on to emphasize

the extremely narrow scope of section 1350 jurisdiction under the *Filartiga* formulation. Judge Kaufman characterized the torturer in *Filartiga* as follows: "Indeed, for purposes of civil liability, the torturer has become – like the pirate and slave trader before him – *hostis humani generis*, an enemy of all mankind." *Filartiga*, 630 F.2d at 890. The reference to piracy and slave-trading is not fortuitous. Historically these offenses held a special place in the law of nations: their perpetrators, dubbed enemies of all mankind, were susceptible to prosecution by any nation capturing them.

*Id.* at 781.

Judge Bork viewed section 1350 differently. He argued that "it is essential that there be an explicit grant of a cause of action before a private plaintiff be allowed to enforce principles of international law in a federal tribunal." *Id*. at 801 (Bork, J., concurring); *see also id.* (criticizing the *Filartiga* court's assumed cause of action under section 1350 as "fundamentally wrong and certain to produce pernicious results"). Judge Bork also tentatively indicated that only offenses akin to the principal offenses against the law of nations cited by Blackstone – violation of safe conducts, infringement of the rights of ambassadors, and piracy – would be actionable under the statute. *Id.* at 813-16.

Both Judge Bork and I agreed that the function and scope of section 1350 needed clarification from the Supreme Court. *Id.* at 775 (Edwards, J., concurring) ("This case deals with an area of the law that cries out for clarification by the Supreme Court."); *id.* at 823 (Bork, J., concurring) ("Since section 1350 appears to be generating an increasing amount of litigation, it is to be hoped that clarification will not be long delayed."). The Supreme Court obliged in *Sosa*.

The issue before the Supreme Court in *Sosa* was whether respondent Alvarez, a Mexican citizen, could bring a claim against petitioner Sosa, a Mexican citizen hired by the Drug Enforcement Administration, for an alleged violation of the law of nations arising from his arbitrary detention. The Court first noted that "[section 1350] was intended as jurisdictional," *Sosa*, 542 U.S. at 714, and that it "creat[ed] no new causes of action," *id.* at 724. However, the Court did not stop there. Rather, it held that

> [t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time. . . . We assume, too, that no development in the two centuries from the enactment of § 1350 to the birth of the modern line of cases beginning with *Filartiga v. Pena-Irala* has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law; Congress has not in any relevant way amended § 1350 or limited civil common law power by another statute. Still, there are good reasons for a restrained conception of the discretion a federal court should exercise in considering a new cause of action of this kind. Accordingly, we think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.

*Id.* at 724-25 (citation omitted). The Court thus plainly rejected Judge Bork's suggestion that only violations of the law of nations extant as of 1789 could be brought pursuant to the ATS. *See id.* at 729 (rejecting Justice Scalia's argument that federal courts should be precluded from "recognizing any further international norms as judicially enforceable today").

Ultimately, the Court in *Sosa* rejected the respondent's complaint on the ground that arbitrary detention did not violate a "norm of customary international law so well defined as to support the creation of a federal remedy." *Id.* at 738. However, the Court surely did not foreclose a cause of action under section 1350 based on allegations of official torture. Quite the contrary. *Sosa* "opened the door" to causes of action – such as official torture – that are "firmly grounded on an international consensus." *Saleh*, 580 F.3d at 14.

## B. Torture Committed by U.S. Officials Is Actionable Under the ATS

In this case, appellants allege that they were detained in U.S. military custody in Afghanistan and Iraq and subjected to "torture and other cruel, inhuman or degrading treatment or punishment" as a result of "the orders and derelictions of Defendant [Donald] Rumsfeld and high-level commanders." Consolidated Am. Compl. for Declaratory Relief and Damages ¶¶ 1, 8 (Jan. 5, 2006), *reprinted in* Appendix 25, 27. The definition of torture is a matter of some controversy, *see, e.g.*, Judith Resnik, *Detention, The War on Terror, and the Federal Courts*, 110 COLUM. L. REV. 579, 608-16 (2010), to be decided by the District Court in the first instance. Assuming, however, that the offenses articulated in appellants' complaint constituted torture – which the Government does not dispute in its brief – I believe that appellants' claims are actionable under section 1350.

Having established that the ATS grants a cause of action for clear and definite violations of the law of nations, the next question is whether an alien may sue *a state actor* under section 1350 to seek redress for torture. I can find nothing in the text or history of section 1350 to warrant excluding state actors from its coverage.

14

The plain text of section 1350 – "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States" – does not exclude lawsuits against state actors. There continues to be much debate about the origin and original purpose of section 1350. *See, e.g.,* Thomas H. Lee, *The Safe-Conduct Theory of the Alien Tort Statute*, 106 COLUM. L. REV. 830 (2006); William S. Dodge, *The Historical Origins of the Alien Tort Statute: A Response to the "Originalists,"* 19 HASTINGS INT'L & COMP. L. REV. 221 (1996); William R. Casto, *The Federal Courts' Protective Jurisdiction over Torts Committed in Violation of the Law of Nations*, 18 CONN. L. REV. 467 (1986). However, I can find no compelling evidence in these or any other articles, the words of the statute itself, legislative materials, or the applicable case law to suggest that, in enacting section 1350, Congress made a "legislative judgment," *Sosa*, 542 U.S. at 727, to *preclude* suits against U.S. officials brought under section 1350. The same holds true for Congress' more recent enactments of the TVPA, the DTA, and the 2006 MCA. In fact, as noted in Part I, *supra*, both the Legislative and Executive Branches have long condemned torture perpetrated under color of official authority. Not only has torture been condemned, "[t]orture has long been illegal" in our nation. 151 CONG. REC. 30,756 (2005) (statement of Sen. Graham).

Although the Supreme Court has held that "special factors" counsel against a remedy for a constitutional violation under *Bivens* whenever the injury arises out of activity "incident to [military] service," *United States v. Stanley*, 483 U.S. 669, 681 (1987) (internal quotation marks omitted); *see also Chappell v. Wallace*, 462 U.S. 296 (1983) (denying *Bivens* action to military personnel suing superior officers for injuries sustained in course of military service), this reasoning does not translate to actions brought pursuant to section 1350. This is so because, when section 1350 was enacted, Congress expressly gave the federal

courts jurisdiction over "[torts] committed in violation of the law of nations." 28 U.S.C. § 1350. *See Sosa*, 542 U.S. at 724 (noting that section 1350 "is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time"). By contrast, constitutional claims under *Bivens* are not brought pursuant to any statute; the Supreme Court in *Bivens* "fashion[ed] a new, judicially crafted cause of action," *Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001), without relying on a congressional imprimatur akin to section 1350.

This court's recent holding in *Saleh* that a private government contractor could not be liable for torture under section 1350 also does not control the disposition of this case. Unlike the appellants in the current case, who seek relief against state actors both in their individual and official capacities, the plaintiffs in *Saleh* were "unwilling to assert that the contractors [were] state actors." 580 F.3d at 15. *Saleh*'s holding – that, "[a]lthough torture committed by a state is recognized as a violation of a settled international norm, that cannot be said of private actors," *id*. – therefore has no bearing on the availability of a cause of action under section 1350 based on allegations of deliberate torture perpetrated under color of official authority.

The *Saleh* decision also points out that, although "Congress has frequently legislated on [the subjects of torture and war crimes] in such statutes as the TVPA, the Military Commissions Act, 10 U.S.C. § 948a *et seq*., the federal torture statute, 18 U.S.C. 2340-2340A, the War Crimes Act, 18 U.S.C. § 2441, and the Uniform Code of Military Justice, 10 U.S.C. § 801 *et seq*.," it has never created a cause of action for victims of torture committed by private contractors. 580 F.3d at 16. But again, these facts are of little moment here because this case involves state actors, not private contractors, and all of the statutes cited in *Saleh* were passed long after the Second Circuit's landmark

decision in *Filartiga* recognized a cause of action for *official torture* under section 1350. Furthermore, neither the text of the aforementioned statutes nor the coinciding legislative histories indicate any intent by Congress to limit or preempt *Filartiga*'s interpretation of section 1350. In fact, there are congressional statements to the contrary. *See* S. REP. NO. 102-249, at 4 (1991) (noting that "[s]ection 1350 has other important uses and should not be replaced" by TVPA); H.R. REP. NO. 102-367, at 3 (1991), *reprinted in* 1992 U.S.C.C.A.N. 86 (same); 151 CONG. REC. 30,757 (2005) (statement of Sen. McCain) (noting that torture-related provisions of the Detainee Treatment Act, which were re-passed as part of the 2006 MCA, "do not eliminate or diminish any private right of action otherwise available").

Finally, although this court in *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 206-07 (D.C. Cir. 1985), appeared to hold that no suits can be brought under section 1350 against U.S. officials in their personal capacities, Congress superseded this holding when it passed the Westfall Act. *Sanchez-Espinoza* is inapposite because the court dismissed the plaintiffs' claims in that case on the ground of *common law* immunity. We know, however, that Congress may override a judicial decision resting on a common law principle. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 315 (1981) ("[T]he question [is] whether the legislative scheme spoke directly to a question . . . not whether Congress had affirmatively proscribed the use of federal common law." (quotation omitted)); *see also id.* at 317 ("[W]e start with the assumption that it is for Congress, not federal courts, to articulate the appropriate standards to be applied as a matter of federal law." (footnote and internal quotation marks omitted)). Congress did just that when it passed the Westfall Act.

The Westfall Act "limits the relief available to persons injured by Government employees acting within the scope of their employment." *United States v. Smith*, 499 U.S. 160, 161 (1991). However, what is significant here is that the Westfall

Act excepts from its grant of immunity all civil actions "brought for a violation of the Constitution of the United States" or "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. §§ 2679(b)(2)(A), (b)(2)(B).

In my view, Congress' decision to overrule *Westfall v. Erwin*, 484 U.S. 292 (1988), and to codify the official immunity doctrine, including the section 2679(b)(2)(A) and (b)(2)(B) exceptions – which are explicit waivers of immunity – clearly preempted any preexisting common law applications of immunity with respect to the same matters. *See Westfall*, 484 U.S. at 300 ("Congress is in the best position to provide guidance for the complex and often highly empirical inquiry into whether absolute immunity is warranted in a particular context."). There is no qualifier to section 2679(b)(2)(B) for situations in which "the basis for jurisdiction requires action authorized by the sovereign as opposed to private wrongdoing," *Sanchez-Espinoza*, 770 F.2d at 207, nor is there any indication in the legislative history that Congress intended for such an exception to apply, H.R. REP. 100-700 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945. The availability of immunity from section 1350 actions therefore depends on the application of the Westfall Act.

## C. Does the Westfall Act Bar Claims Asserting Official Torture?

Federal courts, with "great caution," are authorized by statute to recognize a cause of action under section 1350 for "definite" and "accept[ed]" violations of the law of nations. *Sosa*, 542 U.S. at 732. The United States has consistently and repeatedly condemned the use of official torture. And it is undisputed that "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights, regardless of the nationality of the parties." *Filartiga,* 630 F.2d at 878. However, in order

for appellants' suits for official torture to proceed, they must fall within the Westfall Act's exception for actions "brought for a *violation of a statute* of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. § 2679(b)(2)(B) (emphasis added).

The answer to the question whether the Westfall Act bars appellants' claims turns on how section 1350 is viewed. There are at least two possible constructions of the ATS:

(1) the ATS is a statute that merely serves as a jurisdictional vehicle for violations of the law of nations; or

(2) the ATS itself *incorporates* the law of nations and furnishes jurisdiction over causes of action based on violations of definite and accepted principles under the law of nations.

If the latter construction is correct, it follows that section 1350 is capable of being violated. This is not an easy issue, and I would be naive to suggest otherwise. But because I conclude that the ATS incorporates the law of nations, I believe that it is a "statute" that fits the Westfall Act exception.

### 1. The ATS "Incorporates" the Law of Nations, and It Would Be Ironic To Conclude Otherwise

The Court in *Sosa* made clear that section 1350 differs from other jurisdictional statutes, such as 28 U.S.C. § 1331, because it allows courts to entertain claims derived from the law of nations. *See* Stephen Satterfield, Note, *Still Crying Out for Clarification: The Scope of Liability Under the Alien Tort Statute After* Sosa, 77 GEO. WASH. L. REV. 216, 221-22 (2008) (deeming section 1350 an "'interactive' jurisdictional statute" because it "laid the jurisdictional foundation that allowed the newly formed district courts to hear causes of action arising under the law of nations"). As the Court says in *Sosa*, "the ATS

was meant to underwrite litigation of a narrow set of common law actions derived from the law of nations." 542 U.S. at 721. Therefore, pursuant to the ATS, federal courts have an obligation to recognize causes of action based on clear and definite violations of the law of nations. And, as the Court noted, the law of nations may be enforced under section 1350 "*without further statutory authority*." *Id*. at 729 (emphasis added).

In assessing the ATS, *Sosa* read the Court's precedents to hold that

- "United States courts apply international law as a part of our own in appropriate circumstances";

- "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination"; and

- "The Court is bound by the law of nations which is a part of the law of the land."

*Sosa*, 542 U.S. at 729-30 (brackets and citations omitted). As Judge William A. Fletcher has noted, "[t]he Court's decision [in *Sosa*] . . . necessarily implies that the federal common law of customary international law is federal law in the supremacy-clause sense." William A. Fletcher, *International Human Rights in American Courts*, 93 VA. L. REV. 653, 665 (2007). To me, this indicates that section 1350 itself effectively incorporates the law of nations.

My line of analysis can be disputed. What cannot be doubted, however, is that it would be ironic to conclude that the Westfall Act bars claims resting on allegations of official torture. Under the majority's approach, despite the fact that torture has long been illegal under United States law, *see supra*,

a *United States official* who tortures a foreign national in a foreign country is not subject to suit in an action brought under section 1350, whereas a *foreign official* who tortures a foreign national in a foreign country may be sued under section 1350. *E.g.*, *Filartiga*, 630 F.2d 876 (allowing action to proceed under section 1350 against Paraguayan official for torture committed in Paraguay).

This is a bizarre result, because, in enacting the Westfall Act, Congress apparently meant only to immunize common-law torts against federal officials. *See* H.R. REP. NO. 100-700, at 2 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5945, 5945 (noting that purpose of bill was to "provide immunity for Federal employees from personal liability for *common law torts* committed within the scope of their employment" (emphasis added)); *id.* at 6, *reprinted in* 1988 U.S.C.C.A.N. at 5950 ("Common law torts are the routine acts or omissions which occur daily in the course of business and which have been redressed in an evolving manner by courts for, at least, the last 800 years."); *see generally* Karen Lin, Note, *An Unintended Double Standard of Liability: The Effect of the Westfall Act on the Alien Tort Claims Act*, 108 COLUM. L. REV. 1718, 1740-45 (2008) (arguing that Congress only intended the Westfall Act to apply to state-law torts). Indeed, the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988), which Congress specifically overruled in passing the Westfall Act, addressed immunity in the context of a common-law negligence suit against federal employees. There is no evidence to indicate that Congress meant to address or foreclose actions under section 1350 brought against federal officials for torture; clear violations of the law of nations, such as torture, are not akin to the types of "routine acts or omissions" that Congress appears to have had in mind. Therefore, it is ironic, to say the least, that "[t]he Westfall Act . . . has proved to be a practically 'impenetrable shield' for [ATS] claimants against individual U.S. officials." Lin, 108 COLUM. L. REV. at 1736-37.

### *2. Deconstructing the Westfall Act*

The Westfall Act provides as follows:

The remedy against the United States provided by [the Federal Tort Claims Act] for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment is *exclusive* of any other civil action or proceeding for money damages by reason of the same subject matter against the employee whose act or omission gave rise to the claim or against the estate of such employee. Any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is *precluded* without regard to when the act or omission occurred.

28 U.S.C. § 2679(b)(1) (emphases added). In sum, the Westfall Act prohibits civil suits against U.S. employees in their individual capacities arising out of the scope of their employment.

As noted above, however, the Westfall Act excepts from its grant of immunity all civil actions "brought for a violation of the Constitution of the United States" or "brought for a violation of a statute of the United States under which such action against an individual is otherwise authorized." 28 U.S.C. §§ 2679(b)(2)(A), (b)(2)(B).

Appellants argue that their section 1350 claims fall within the Westfall Act's exception for "violation[s] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized." 28 U.S.C. § 2679(b)(2)(B). In response, the Government relies on the Supreme Court's decision in *United States v. Smith*, 499 U.S. 160 (1991), to support the proposition that "this exception to the Westfall

Act . . . [applies] only to federal statutes that provide both a cause of action *and* the substantive law which the employee is alleged to have violated." Appellees' Br. at 47 (emphasis in original). The Government also refers to the Ninth Circuit's decision in *Alvarez-Machain v. United States*, 331 F.3d 604 (9th Cir. 2003) (en banc), *rev'd on other grounds sub nom. Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004).

The Ninth Circuit concluded that "a claim under the [ATS] is based on a violation of international law, not of the [ATS] itself." 331 F.3d at 631. Several district courts have followed this line of analysis. *See, e.g., Al-Zahrani v. Rumsfeld*, 684 F. Supp. 2d 103, 114-16 (D.D.C. 2010); *Rasul v. Rumsfeld*, 414 F. Supp. 2d 26, 37-38 (D.D.C. 2006) (issue not appealed); *Bancoult v. McNamara*, 370 F. Supp. 2d 1, 9-10 (D.D.C. 2004). In my view, these decisions are flawed, because they fail to acknowledge a critical distinction between the Gonzalez Act – the statute at issue in *Smith* – and section 1350.

The Gonzalez Act, like the Westfall Act, is a grant of federal employee immunity. Specifically, it provides that "in suits against military medical personnel for torts committed within the scope of their employment, the Government is to be substituted as the defendant." *Smith*, 499 U.S. at 162 (citing 10 U.S.C. §§ 1089(a), (b)). In *Smith*, the plaintiffs sued a U.S. military physician for negligence in federal court, and the United States sought to substitute itself for the physician under the Westfall Act. The plaintiffs objected, arguing that their claim would have been permitted under the Gonzalez Act due to an implicit exception in that statute, and that, as a result, the claim should be exempted from Westfall Act immunity due to § 2679(b)(2)(B)'s exception for claims brought pursuant to a federal statute. The Supreme Court disagreed, holding that: "[n]othing in the Gonzalez Act imposes any obligations or duties of care upon military physicians. Consequently, a physician allegedly committing malpractice under state or

foreign law does not 'violate' the Gonzalez Act."  *Smith*, 499 U.S. at 174.

The Court's decision in *Smith* seems plainly inapposite here.  In contrast to the Gonzalez Act, section 1350 is a statute enabling the federal courts to *impose* liability – not *limit* liability.  Because section 1350 *expressly* incorporates the "law of nations," it is a statute that can be violated.

### 3. The ATS Is Not a Jurisdictional Statute Akin to Section 1331 – It Is Therefore a "Statute" Sufficient To Satisfy the Westfall Act Exception

The Supreme Court emphasized in *Sosa* that, in comparing the ATS with the grant of federal-question jurisdiction, 28 U.S.C. § 1331, "[s]ection 1350 was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations; and we know of no reason to think that federal-question jurisdiction was extended subject to any comparable congressional assumption."  542 U.S. at 731 n.19.  Thus, if Congress repealed section 1350, federal courts would have no authority today to recognize common law causes of action for violations of customary international law, such as torture.  *See Mohamed v. Rajoub*, 634 F.3d 604, 609-10 (D.C. Cir. 2011) (holding that appellant had no cause of action for violation of customary international law pursuant to 28 U.S.C. § 1331); *see also Sosa*, 542 U.S. at 712 ("[W]e think that at the time of enactment [of the ATS] the jurisdiction enabled federal courts to hear claims in a very limited category defined by the law of nations and recognized at common law.").  This makes section 1350 inherently different from other jurisdictional statutes, such as section 1331, and quite different from the Gonzalez Act.  *See generally* Satterfield, 77 GEO. WASH. L. REV. at 221-22; William S. Dodge, *Bridging* Erie: *Customary International Law in the U.S. Legal System After* Sosa v. Alvarez-Machain*, 12 TULSA J. COMP. & INT'L L. 87, 97-100 (2004) (analyzing *Sosa*'s

discussion of congressional intent in enacting section 1350 as compared to section 1331).

Section 1350 parallels section 301(a) of the Labor Management Relations Act of 1947. Section 301(a) provides that

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). In *Textile Workers Union of America v. Lincoln Mills of Alabama*, 353 U.S. 448 (1957), the Supreme Court held that section 301(a) "authorizes federal courts to fashion a body of federal law for the enforcement of these collective bargaining agreements," 353 U.S. at 451 – despite the fact that the plain text of this provision only speaks to federal jurisdiction. *See also Sosa*, 542 U.S. at 726 (citing *Lincoln Mills* as an example of a "haven" of federal common law). Just as section 301(a) provides jurisdiction *and* allows federal courts to create federal common law to enforce collective bargaining agreements, section 1350 provides jurisdiction *and* allows federal courts to create a federal common law remedy for definite and accepted violations of customary international law. In other words, it is section 1350, not international law, that gives federal courts the authority to enforce "international norms that a federal court c[an] properly recognize as within the common law enforceable *without further statutory authority*." *Sosa*, 542 U.S. at 729 (emphasis added). This makes section 1350 "statutory authority" sufficient to satisfy the Westfall Act exception.

It might be argued that *Smith* should be read to bar the Westfall Act exception from applying here, because section 1350 does not *explicitly* incorporate the law of nations. That was the view taken by the Ninth Circuit, even as that court acknowledged that the Gonzalez Act and section 1350 have very different purposes. *See Alvarez-Machain*, 266 F.3d at 1054. Although this argument is not without force, I disagree. Like section 301(a), as interpreted by the Court in *Lincoln Mills*, a federal statute may incorporate enforceable substantive rights even though the statute does not spell out the details of those rights. It is true that *Sosa* says that, since *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938), "the general practice has been to look for legislative guidance before exercising innovative authority over substantive law," *Sosa*, 542 U.S. at 726; but *Sosa* opened the door to the recognition of causes of action alleging wrongs – such as official torture – that violate the law of nations.

In short, I believe that *Smith* has no application here, because, as noted above, *Smith* was focused on the Gonzalez Act, not section 1350. Unlike the Gonzalez Act, section 1350 is a statute authorizing the federal courts to *impose* liability – not *limit* liability. I therefore conclude that section 1350 fits within the exception to the Westfall Act for "violation[s] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized," 28 U.S.C. § 2679(b)(2)(B). Accordingly, I dissent from the majority's disposition of appellants' claims under section 1350.

### III. CONCLUSION

Twenty-seven years ago, in *Tel-Oren*, I said that "[t]his case deals with an area of the law that cries out for clarification by the Supreme Court." 726 F.2d at 775. I say the same again here.

I thought that the Court's decision in *Sosa* afforded the lower federal courts the amplification and clarification necessary to understand how to process claims properly brought under section 1350. Obviously, I was mistaken. Some of my colleagues on the federal bench believe that the Westfall Act takes away what the ATS gives insofar as it allows causes of action against state actors who perpetrate torture under the color of official authority. Ultimately, after careful consideration of this difficult question, I think the decisions that have endorsed this approach are misguided.

Even if ATS actions against state actors were barred by principles of common law immunity, as this court thought in *Sanchez-Espinoza*, I believe that Congress vitiated that immunity when it enacted the Westfall Act. In my view, Congress' decision to overrule *Westfall v. Erwin*, 484 U.S. 292 (1988), and to codify the official immunity doctrine, including the 28 U.S.C. § 2679(b)(2)(A) and (b)(2)(B) exceptions – which are explicit waivers of immunity – clearly preempted any preexisting common-law applications of immunity with respect to the same matters. And I believe that actions that are cognizable under section 1350 – such as allegations of official torture – fall within the Westfall Act's exception for "violation[s] of a statute of the United States under which such action[s] against an individual [are] otherwise authorized." *Id*. § 2679(b)(2)(B). On this last point, I agree with Judge Fletcher that *Sosa* "necessarily implies that the federal common law of customary international law is federal law in the supremacy-clause sense." William A. Fletcher, *International Human Rights in American Courts*, 93 VA. L. REV. 653, 665 (2007). For me this means that it is section 1350, not international law, that gives federal courts the authority to enforce international norms that a federal court can properly recognize as within the common law enforceable "without *further* statutory authority." *Sosa*, 542 U.S. at 729 (emphasis added). As I see it, section 1350 is "statutory authority" sufficient to satisfy the Westfall

Act exception. Some may disagree with my analysis, but at this point I cannot see why.

As I noted above, I think it is fair to say that the developing case law is ironic. As one commentator has noted:

In the past thirty years, the [ATS] has become an important instrument in advancing human rights claims before U.S. courts. In light of this exceptional statute, the Westfall Act's effect of immunizing U.S. officials is doubly ironic: Not only has the country that led the way in allowing aliens to vindicate their rights against foreign officials maintained official immunity for its own officials even in the face of modern human rights accountability, but it has also done so unintentionally. As a result, U.S. courts apply a double standard of liability whereby foreign officials may face liability for international law violations while U.S. officials have absolute immunity for those same violations.

Karen Lin, Note, *An Unintended Double Standard of Liability: The Effect of the Westfall Act on the Alien Tort Claims Act*, 108 COLUM. L. REV. 1718, 1719 (2008) (footnotes omitted).

I do not agree with the courts that have helped to create this irony by granting immunity to United States officials from ATS actions. It is hard to fathom why Congress would pass a law that makes all government officials – except our own – subject to liability for torture committed overseas. There is nothing to indicate that Congress meant to achieve this result when the Westfall Act was passed. Maybe it is time for Congress to give the judiciary better directions on this matter.